HUMBLE OIL AND REFINING COMPANY ET AL V.
EDWIN K. ATWOOD ET AL.

No. A-3126. Decided October 31, 1951.
Rehearing overruled January 16, 1952.
(244 S. W., 2d Series, 637.)

618

*S. L. Gill, Roger F. Robinson, Jesse G. Foster, S. P. Neilson,* all of Raymondville, *R. E. Seagler, M. P. Pearson, Felix A. Raymer,* all of Houston, *LeRoy G. Denman, Jr., Robert Lee Bobbitt, Jr.,* both of San Antonio, *Jones, Hardie, Grambling & Howell* and *Ben R. Howell,* all of El Paso, for petitioners, Humble Oil and Refining Co. et al.

The Court of Civil Appeals erred in reversing the judgment of the trial court on the holding that this suit was one in redemption and consequently different from that asserted in the Federal litigation. Also in not affirming the trial court's judgment in that all the cases were to remove cloud and cancel the leases and therefore the judgment of the trial court in sustaining defendants' plea of res adjudicata was correct. Nichols v. Dibrell, 61 Texas 539; Schrock v. Campbell, 34 S.W. 2d 324; Landa v. Isern, 141 Texas 455, 174 S.W. 2d 310.

*Thomas Hart Fisher,* of Chicago, Ill., *Bascom Cox, Fred B. Wagner, John Q. Adams, Taylor, Cox Wagner & Adams,* of Brownsville, *Black & Staton* and *Charles L. Black,* of Austin, for respondents, the Atwoods.

MR. JUSTICE WILSON delivered the opinion of the Court.

The parties will be identified as in the trial court where the Atwoods were plaintiffs and the defendants were the Humble Oil & Refining Company, the King Ranch, a corporation, and various members of the King and Kleberg families.

The principal question is: Can an oil and gas lease be adjudicated to be both a mortgage and a grant of minerals under a line of cases beginning with Stamper v. Johnson, 3 Texas 1, and continuing through Bradshaw v. McDonald, 147 Texas 455, 216 S. W. 2d 972? The answer is "No."

We reach this question as a result of long and involved litigation between the Atwoods and other heirs who jointly inherited the King Ranch. This ranch was administered for a period under a trust established by an ancestor of all parties. Becoming dissatisfied with the administration of the trust, the

Atwoods filed and prosecuted to judgment three suits in the U. S. District Court for the Southern District of Texas, styled, respectively: Atwood v. Kleberg, Equity Action No. 74, Main Case and Ancillary, on appeal 163 F. 2d. 108; Atwood v. Kleberg, Equity Action No. 102; and Atwood v. Kleberg, Equity Action No. 101, on appeal 133 F. 2d. 69, on rehearing 135 F. 2d. 452. That portion of this Federal litigation material to this case consisted of an attack upon oil and gas leases executed by the trustees. In the Federal litigation it was determined that the minerals had not been severed prior to the creation of the trust; that the trustees had authority to execute the oil and gas leases; that the leases as executed did not violate the trustees' duty to the cestui que trust; and that the oil and gas leases involved here were valid.

Following these adverse decisions, the Atwoods brought this suit in the Texas courts seeking: (1) an adjudication that the oil and gas lease on that portion of the ranch partitioned to them is a mortgage, and for redemption; (2) cancellation of the oil and gas lease "because extending 18½ years and longer beyond the end of a limited ten-year trust form;" (3) reformation; (4) an accounting; (5) damages; (6) and general relief. The King Ranch corporation and other defendants joined Humble in resisting the attacks.

Both sides plead res adjudicata and estoppel by reason of the Federal litigation and both vigorously argue that Moore v. Snowball, 98 Texas 16, 81 S. W. 5, 66 L. R. A. 745, supports their contention. On Item (1), plaintiffs contend that the debt was not finally paid until after the judgments in the Federal cases, so that the case at bar neither could nor should have been urged in that litigation. The trial court severed the issues of res adjudicata and estoppel and upon them rendered judgment for defendant that plaintiffs take nothing.

In the case at bar the Court of Civil Appeals held (239 S. W. 2d. 412):

(a) That in the Federal litigation plaintiffs sought to have the leases declared *invalid* for a number of reasons, all of which were determined against them;

(b) that in the case at bar plaintiffs do not seek to have the leases declared invalid but instead seek to have them declared *valid as mortgages;*

(c) that the cause of action asserted in the case at bar could not and should not have been raised in the Federal litigation

because of an action to redeem from a mortgage may not be brought prior to the satisfaction of the obligation, which did not occur until after the termination of the Federal litigation.

(d) that the issue of mortgage *vel non* was not determined for either party in the Federal litigation.

(e) that the judgment of the trial court should be reversed and the cause remanded for trial on the issue of mortgage.

Items (2) and (3) above were determined against plaintiffs in Atwood v. Kleberg, 133 F. 2d. 69, and we do not pass upon them other than to hold that they were there decided. Since we have determined that no cause of action is asserted in Item (1), plaintiffs are not entitled to either damages or general relief under Items (5) and (6).

Upon Item (1) we do not reach Moore v. Snowball, supra, Defendants contend that the Federal courts have three times adjudicated the leases under attack here to be valid mineral leases and an instrument cannot be at the same time both a lease and a mortgage. Plaintiffs reply that:

"This argument ignores the fact that, while a given conveyance may be a lease in truth and in fact, yet it may also have been executed as security for a debt and for that reason in equity 'be treated as a mortgage.'"

Clearly such an attack as that alleged in Item (1) is barred by the parol evidence rule unless the attack comes within the exception that a deed absolute may be proved to have been intended to serve as security for a debt and adjudicated to be a mortgage.

In Bradshaw v. McDonald, supra, is found the statement that "the rule allowing an absolute deed to be proved a mortgage * * * relates to that one type of document and to that sole purpose." Plaintiffs contend, to the contrary, that this exception to the parol evidence rule should operate upon any estate in land, should not be limited to a deed of the entire fee, and governs the case at bar, citing Stephens v. Sherrod, 6 Texas 294; De Bruhl v. Maas, 54 Texas 464; Nugent v. Riley, 42 Mass. (1 Met.) 117; Lanfair v. Lanfair, 35 Mass. (18 Pickering) 299; Barnett v. Williams, 31 Ky. Law Report 255, 101 S.W. 1191; Johnson v. Hataway, 155 Ala. 516, 46 So. 760; Mostyn v. Lancaster, 23 Ch. D. 583. These citations require an analysis of the basic elements of a mortgage in Texas and its legal effect.

The early common law recognized two kinds of landed securities. Blackstone in Sec. III of Chap. X (Of Estates Upon Condition) p. 156, identifies these as "* * ** *vivum vadium,* or living pledge; and *mortuum vadium,* dead pledge, or mortgage." He defines a mortgage as a grant of fee upon condition of repayment of a debt and this has come down as the traditional language used in most mortgage forms.

Originally, possession passed by livery of seizin to the mortgagee. And back of this lies one of the historical reasons for the use of language of grant in a mortgage. Because the distinction between interest and usury was a slow growth, the emergence of the concept of a return upon money capital (as distinguished from land) brought on an intense conflict between the ecclesiastical and common law courts. During a long period any return upon a loan might be declared usury, the parties to it caught in the friction between the common law and the ecclesiastical jurisdictions, and the unfortunate creditor subjected to fine, imprisonment, ransom at the King's pleasure, and exposure on the "pillaire, to their open rebuke and shame." So the creditors sought refuge in the feudal tenures and secured a return upon their loans in the form of rents and profits accompanying the right of possession. As the concept of usury changed and the law recognized interest as "toothless" usury, [1] and as Chancery developed the equity of redemption, possession remained with the mortgagor, but the form of the conveyance continued in general use, and often plagues the courts to this day. Osborne, *On Mortgages,* Sec. 5.

Because the *mortuum vadium* was a use of legal machinery to accomplish a purpose for which it had not been designed, many harsh results flowed from it, for "* * * the common law knew of no better way to treat debtors than to make them live up to their bargains, * *." Thomas, *On Mortgages,* p. 6. To the common law judges, thoroughly drilled in the formal discipline of Traditional Logic, the law often became an exercise in logic. Walled in by the rigidity of their syllogisms, they were untouched by the currents of empirical thought which turned Chancery towards the Civil Law. The result is described by Coote in his *On Mortgages,* Chap. I, (ii), p. 4.

"Thus mortgages stood at common law, and it is difficult to conceive, if the Courts of Law had been so inclined (which it does not seem they were), on what principle they could have

---

[1] J. B. C. Murray, *History of Usury,* Chap. II.

proceeded in giving the debtor relief. The forfeiture was complete; the mortgagee, by the default of the mortgagor, had become the absolute owner of the estate; it could not be divested from him without a reconveyance, and there remained no remedy short of an actual legislative enactment, without disturbing the settled landmarks of property."

To remedy this situation, Chancery evolved the equity of redemption by holding that although * * * they could not alter the legal effect of the forfeiture at common law, they operated on the conscience of the mortgagee, and, acting *in personam*, they declared it unreasonable that he should retain for his own benefit what was intended as a mere security; and they adjudged * * * that the mortgagor had an equity to redeem on payment * * * notwithstanding the forfeiture at law. * * * The judges of common law strenuously opposed the introduction of this novelty; and though ultimately defeated by the increasing power of equity, they nevertheless in their own Courts still adhered to the rigid doctrine of forfeiture, * * *." Coote, *On Mortgages*, Chap. II, (iii) pp. 12, 13. See also Osborne *On Mortgages*, Sec. 1, p. 6.

There followed a period of confusion caused by jealousy between the Courts of Law and Equity.

"* * * For a number of years both law and equity courts exercised concurrent jurisdiction over mortgages, resulting in great confusion, more especially while the courts of the common law continued to be presided over by men whose early training had led them to regard the interference of the courts of equity as an offensive innovation. But in course of time the justness of the decrees of the chancellors gradually came to be recognized by the common-law courts and were acquiesced in by them." Jones, *on Mortgages*, Sec. 9, p. 11.

The equitable views finally made their way into the common law in the opinions of Lord Mansfield who was, however, criticized for having "on his mind prejudices derived from his familiarity with the Scottish law, where law and equity are administered in the same courts. * * *." Powell on *Mortgages, p.* 267.

In America, the states are split into two main groups on mortgages. Some states give effect to the language of grant in a mortgage and are referred to as "title" states for the reason that they hold title passes. The other group are called "lien" states for they hold that neither title nor possession passes. There are many variations between them.

■ Our Texas mortgage developed in a blended system of Law and Equity administered in one court. In Stephens v. Sherrod, supra, it is recognized, upon authority of Kent and Story, that our mortgage grew out of sales upon condition of non-payment of a debt, or accompanied by a defeasance. One of the differences between the *mortuum vadium* and the Texas mortgage is that if the condition were not faithfully complied with under the *mortuum vadium,* the land was forever lost, while generally under our Texas mortgage it was early determined that the legal title remains in the mortgagor and can only be transferred by foreclosure, or by sale where power of sale is contained in the instrument. Although to this day the early form of an absolute grant with a defeasance is in common use, now by statute and court decisions a mortgage is a mere lien regardless of the language used in the instrument itself. Duty v. Graham, 12 Texas 427; Willis v. Moore, 59 Texas 628; Hudson v. Eisenmayer, Sr., Milling and Elevator Co., 79 Texas 401, 15 S. W. 385; Carroll v. Edmondson, 41 S.W. 2d. 64. As a result of Chancery action in developing the equity of redemption, the common law courts were forced to superimpose upon the parol evidence rule an exception allowing a deed absolute to be adjudicated a mortgage if the parties intended that it be security for a debt.

■ We reach now our immediate problem: What is the result of equitable action upon a deed declared to be a mortgage? The answer can only be that it becomes a lien regardless of the language of grant in the deed just as a mortgage is declared to be a lien regardless of its language of grant.

The nature of the equitable action involved is not clear. The phrase *equity of redemption* meant originally the equitable right of the mortgagor to recover his property upon payment of his debt. Subsequently it was applied to the mortgagor's rights before default as an equitable estate, and then again loosely to the difference in value between the debt and the security. Pomeroy, *Equity Jurisprudence,* Sec. 1180. Osborne, supra, Sec. 7. Here we are concerned only with the nature of the equitable cause of action. The transition from a written defeasance separate from the deed to a verbal defeasance presents the main difficulty because of the Statute of Frauds. Some writers treat this cause of action as one for specific performance of a promise to execute a legal mortgage. Osborne, supra, Sec. 27, but this clearly does not fit the case at bar. Some writers treat it as specific performance of a verbal promise to hold as security. Osborne, supra, Sec. 28. In the *Restatement of the*

*Law,* the problem of declaring a deed to be a mortgage is discussed under Restitution, Chap. 10, where it is treated as a problem in constructive trust, Sec. 182, pp. 735, 736; or again it is treated as a question of unjust enrichment. Glenn, *On Mortgages* Sec. 171. In some jurisdictions it is approached as a question of reformation. Glenn, *supra,* Sec. 11. Perhaps one basis might be, in the main, historical, or stated another way, a refusal to retrogress. The courts will not allow a creditor to go back of the evolution of the law and take advantage of a form of conveyancing which anteceded the development of the mortgage. A creditor may not turn back the pages of legal history and force the court to re-fight the old battle between law and equity. When he tries to do so he will be brought up to date by having his deed declared to be a mortgage even though a portion of the transaction be verbal. The same reasons prevent a retrogression which impelled the development of the equity of redemption.

This equitable doctrine has been used in Texas primarily to prevent an overreaching although there may have been no misrepresentation of fact at the execution of the instrument. In the case which introduced this exception to the parol evidence rule into Texas jurisprudence, Stamper v. Johnson, 3 Tex. 1, the Court recognizes that the exception is truly an equitable doctrine.

In Eckford v. Berry, 87 Texas 415, 28 S. W. 937, it is stated that one of the reasons for this exception to the parol evidence rule was that "the skill of the conveyancer, aided by the stern rule of evidence, would have enabled the exacting creditor to overreach and finally crush the necessitous and defenseless debtor in a court of law, despite the equity of redemption created and cherished alone by the courts of equity for the protection of the debtor."

Without specifying the exact nature of the equitable remedy, the Texas courts in this situation have from the first disregarded the acts of the parties in executing the instrument and raised a lien just as they have disregarded the actual language of the ordinary mortgage. It is clear that in Texas when a deed absolute on its face is declared to be a mortgage it is not a grant of title but is instead from its inception a mere lien. In Mann v. Falcon, 25 Texas 271, the Court said:

"* * * the verdict * * *. * * * establishes that the supposed title relied on by the plaintiffs for a recovery, was a mortgage, and the consequence is that the rights and remedies of mort-

gagor and mortgagee attach to the parties to the instrument, and to the parties to the suit, * * *."

■ That the Court has power to look beyond the instrument to the entire factual situation in determining whether or not plaintiffs assert an equity of redemption has been true from its earliest development in Chancery. Coote, *On Mortgages,* Chap. II, (iv) p. 13. This is the law in Texas. In Loving v. Milliken, 59 Texas 423, the Court said:

"In determining whether an instrument is to be construed as an absolute conveyance or a mortgage when there is no defeasance expressly agreed upon equity looks to all the circumstances preceding and attending the execution of the instrument, and sometimes to those which have subsequently occurred."

The transaction at bar in no way resembles the line of cases beginning with Stamper v. Johnson, supra. Here the trustees of the King ranch were unable in 1933 to borrow a very large sum of money they needed from any concern in the business of lending money. Humble, a company whose business is the production, refining, and sale of oil and its products and not the lending of money, had a subsisting oil and gas lease covering a portion of the King Ranch. Humble agreed to cancel this oil and gas lease and to loan the King Ranch $3,500,000.00. The trustees of the King Ranch executed one note for $500,000.00, bearing interest at the rate of five per cent. per annum, payable annually, and a second note for $3,000,000.00. Both of these notes were secured by a deed of trust in favor of Humble. At the same time the trustees granted to Humble two separate oil and gas leases, one of which covered in excess of 900,000 acres and the other in excess of 76,000 acres. Both were for a term of 20 years. Simultaneously, the parties executed a separate contract reciting the execution of the two oil and gas leases and stipulating an agreed annual rental for a 20-year period of $127,824.60 per year. They also agreed that the $3,000,000.00 note was to bear interest at the rate of five per cent. per annum (subsequently reduced to three per cent.). Instead of Humble paying the annual rental in cash and the King Ranch paying the interest in cash, they agreed that the annual rental should be offset against the interest, with a provision for the difference. The King Ranch agreed to pay $150,000.00 upon the principal each year during the second ten years of the 20-year period, with the privilege of paying the notes before maturity. Humble agreed to pay the King Ranch Trust five per cent. interest upon any prepayments made before maturity. The

King Ranch agreed that Humble might, during the first 10 years, apply the proceeds of any royalties accruing under the two oil and gas leases upon the principal indebtedness except that the King Ranch Trust could demand enough of the royalties to pay that portion of its income tax due by reason of the royalties.

Simultaneously with the execution of these instruments the parties entered into another agreement in the form of a letter providing that Humble was not obligated to do exploratory work during the first five years, but that during the remaining 15 years Humble should explore the entire area by approved geophysical and geologic techniques. Humble was not required to drill wildcat wells but was required to drill any offset wells. Humble agreed to develop any productive structure found with reasonable diligence and to produce from such structures under the orders of the Railroad Commission a quantity of oil that was equal to approximately that portion of their total production in Texas that the proven reserves on the leased premises bore to the total Humble proven reserves in Texas.

The leases themselves provided that at the termination of the 20-year period Humble might designate and define in writing the areas from which oil was being produced and retain them so long as oil and gas were produced, it being contemplated that Humble would retain an entire geological structure.

The King Ranch trustees used the money borrowed from Humble to pay pressing short-term loans, Federal estate, and State Inheritance taxes. The balance was expended in operation. The deed of trust covered substantially all of the King Ranch lands and was made subject to the oil and gas mineral leases.

The original King Ranch Trust lasted by its terms 10 years and expired on March 30, 1935, at which time the lands were partitioned, subject to both the mineral leases and the Humble deed of trust.

All of these facts are plead by plaintiffs and copies of the instruments are attached as exhibits to their petition.

There stands out from this transaction the fact that Humble secured an oil and gas lease which obligates it to pay a total rental over a 20-year period in excess of $2,500,000.00. At the same time it loaned the King Ranch $3,500,000.00 at interest and took as security a deed of trust with the proviso that the rentals and royalties from the oil and gas lease should be credited on the debt.

In order to make clear plaintiffs' contention that an instrument they say is a mortgage also operated as a grant of minerals, we copy from their brief:

" * * * Even if the leases did vest a determinable fee simple title in Humble, it can be shown by parol that such title was vested simply as part of the security for a debt.

"* * *

"The entire argument presented by * * * Humble * * * is based upon the reiterated use of the word 'mortgage' and the references made to the various rights and covenants of the leases, including the so-called correlative rights, obligations to drill, etc. None of these provisions are inconsistent with the idea that the leases, however conditioned, may have been executed and delivered as security for a debt. If they were; then so long as the debt remained unpaid and they remained security for its payment, all of their provisions were in full force and effect, including the provisions defining drilling obligations, correlative rights, etc. But these provisions could not survive the payment of the debt for which they were in fact security. With the payment of the debt, they failed because all of these provisions, being mere security for a debt, could not survive payment of the debt."

This contention remotely resembles the ancient *vivum vadium* which Blackstone defines as:

"*Vivum vadium*, or living pledge, is when a man borrows a sum (suppose £ 200) of another; and grants him an estate, as of £ 20 *per annum*, to hold till the rents and profits shall repay the sums so borrowed.

The *vivum vadium* early fell into disuse. A trace of it survives in an obscure form of pledge known as a Welsh mortgage where the mortgagee has possession in lieu of interest upon his debt. It seems to have been "substantially the same as an ordinary mortgagee in possession under the later English law who must account in equity for the rents and profits." Osborne, *On Mortgages*, Sec. 1, p. 4. Any such conception is wholly inconsistent with the actualities of an oil and gas lease.

If plaintiffs' contention be considered against the right and risk of development arising from an oil and gas lease, it is readily apparent that the very nature of an oil and gas lease is inconsistent with such a mortgagor—mortgagee relation-

ship, because, unlike a deed absolute, it imposes positive obligations running from the lessee to the lessor which must be performed under a determinable fee estate, else the estate terminates. The expense of exploration, the payment of rental, the outlay of capital and the time required to pay for development, the duty to protect against drainage, and all of the correlative rights between the parties which arise upon the discovery of oil present an entirely different factual situation from that in which a deed is pledged to secure a debt. If Humble took the risk of drilling a well which turned out to be dry, it might lose the cost of drilling; but if the well produced, royalty from it would be applied upon the debt and, under plaintiffs' contention, thus shorten the life of the lease.

■ The statement quoted from Bradshaw v. McDonald, supra, should not be given the construction that an absolute deed is the only instrument which can be shown to have been intended to be a mortgage. Such a construction is not supported by the authorities. In that case this Court held that it made no difference in proving a deed to be a mortgage that the deed recited a contractual consideration. Our holding here is not in conflict with that case because plaintiffs here seek to insert an additional condition into a determinable fee—that the lease shall last *until the debt be paid*, instead of *so long as oil and gas be produced*. A condition terminating the life of the estate is altogether different from a contractual consideration. As we understand plaintiffs' contention, if they prevailed, they would end up with an instrument which would be during the life of the debt (and consequently the lease) still an oil and gas lease imposing obligations upon the lessee of development, of the payment of rental, etc.,—obligations entirely foreign to our previous conception of the position of a mortgagee and the retention of title by the mortgagor. Normally the mortgagee expends his money when the debt is created and is seeking security for its recovery. He does not lend his money for the purpose of obligating himself to his debtor, nor to search for oil at great risk in the hope that if he strikes oil he will recover his debt and expenses and allow the debtor who has taken no risk the profits. So in reality that which plaintiffs seek to establish here is not a mortgage but a different oil and gas lease which is the very thing the parol evidence rule was devised to prevent, for clearly this is an attempt to insert by parol an additional condition into a determinable fee. As such, it is barred by the parol evidence rule for under Texas law if the instrument be a grant of minerals it cannot at the same time be a mere lien, or mortgage. Willis v. Moore, supra; Tittle v. Vanleer, 89 Texas

174, 29 S. W. 1065, 34 S.W. 715, 37 L. R. A. 337. And it cannot change its nature in mid-stream. From the equity maxim "once a mortgage always a mortgage" it follows that the instrument must have been a mortgage at its inception or not at all. Pomeroy, supra, Sec. 1193. Plaintiffs cannot come into equity and assert that what they have admitted to be a grant is not a grant but is something less, a lien, and seek to have the instrument adjupdicated a lien. Thus stated, their position is untenable. Recognizing this, they do not seek an adjudication that the instrument is a mere lien, but instead seek an adjudication that the instrument is a grant coupled with a determining condition, something altogether different from a lien.

It is true that in McLean & Curry v. Ellis, 79 Texas 398, 155 S.W. 394, it is stated that the right to prove a deed to be a mortgage is a substantial one "not to be varied or defeated by any form of expression or character of recitals contained in the instrument itself." We are not in conflict with that case because our ruling here is based not upon recitals alone but upon the entire factual situation, including the obligations imposed upon the lessees which have been carried out. Loving v. Milliken, supra; Coote, *On Mortgages*, Chap. II, (iv) p. 13.

Most of the cases plaintiffs rely upon are from jurisdictions holding a mortgage to be a grant of fee accompanied by a defeasance. Originally in England there was a grant of the fee. For Coote says that although the Chancery "could not alter the legal effect of the forfeiture at common law," i.e., could not prevent the grant of the fee from finally vesting upon condition broken, still, acting *in personam* they "operated on the conscience of the mortgagee" and forced restitution. So plaintiffs' contention that the instruments at bar could be held both a grant of minerals and at the same time a mortgage under Mostyn v. Lancaster, 23 Ch. D. 583, might have been good in England before 1925. Since 1925 by statute a mortgage in England is a charge upon the land comparable to the American concept of a lien. Osborne, supra, Sec. 12. For the same reason the Massachusetts cases of Nugent v. Riley, supra, and Lanfair v. Lanfair, supra, are not in point. Pomeroy, *Equity Jurisprudence,* Sec. 1187. See also Ewer v. Hobbs, 5 Met. (Mass.) 1, and Howard v. Robinson, 5 Cush. (Mass.) 119.

And again for the same reason the Alabama case of Johnson v. Hataway, 155 Ala. 516, 46 So. 760, where a lease of the timber on the described land to use for turpentine, saw mill and other purposes was held to be a mortgage, is not in point.

See Pomeroy, supra, Sec. 1187. See also Mallory v. Agee, 226 Ala. 596, 147 So. 881, 88 A. L. R. 1107. The Alabama view that a mortgage passes both title and possession was urged in 1854 in the argument of the first Texas case raising this subject, Duty v. Graham, supra, and was rejected.

Plaintiffs do not allege a conditional delivery of the oil and gas lease or contend that the mineral estate was not to vest until the King Ranch trustees defaulted in payment of the debt. Plaintiffs do not here contend that Humble has made a fraudulent use of the instrument by drilling, producing and marketing oil and gas under it and thus bring themselves within the reasoning of Mead v. Randolph, 8 Texas 191, or Redwine v. Coleman, Texas C.C.A. 1934, 71 S. W. 2d 921, writ refused, and indeed they could not because of the Federal litigation. Landa v. Isern, 141 Texas 455, 174 S. W. 2d 310.

■ The debt continued after the execution of the oil and gas lease so plaintiffs do not allege a conditional sale of the oil and gas lease within Ruffier v. Womack, 30 Texas 332.

In discussing the powers of the trustees in the motion for rehearing (135 F. 2d 452) the Circuit Court of Appeals said:

"The proof established beyond controversy that the lease was incident to and a part of the consideration for a loan or mortgage secured under difficult and trying conditions to save the estate and made under the express authority given in the will to borrow money and mortgage the property."

Upon the adverse termination of that case, the Atwoods construed the language quoted just above to mean that the oil and gas lease was itself a mortgage. Following final payment of the debt, they brought this action to redeem the mineral estate under their lands from it. Our holding here is not in conflict with the Federal case, because when the entire opinion and the judgment are examined in that case it becomes clear that the point under discussion was the authority of the trustees to execute an oil and gas lease. Clearly the meaning of the above language is that since the trustees had the authority to borrow money and mortgage the property, they had also the authority to grant an oil and gas lease as a part of the consideration for a loan. We do not pass upon the point of law involved. We do overrule plaintiffs' contention that Atwood v. Kleberg, 135 F. 2d 452, adjudicated the oil and gas leases to be a mortgage. The only conclusion which the opinion and the facts of that case will warrant is that Humble made the loan in exchange for the oil and gas leases.

■■ Having determined that plaintiffs plead no cause of action, it is unnecessary for us to determine whether it was, or either could or should have been adjudicated in the Federal litigation. Plaintiffs' petition is full and we do not believe that plaintiffs can add to it. Accordingly, the judgment of the Court of Civil Appeals is reversed and the judgment of the trial court that plaintiffs take nothing is affirmed without prejudice to plaintiffs' right to an accounting for any money which may be due them as royalty owners under the oil and gas lease. Since plaintiffs prayed for an accounting and that portion of the case was severed before appeal, the trial court may proceed with that portion of the case, but only for the purpose of an accounting.

Costs of appeal are taxed against respondents (plaintiffs below).

Opinion delivered October 31, 1951.

Rehearing overruled January 16, 1952.