John R. EIDSON et al., Appellants,

v.

PERRY NATIONAL BANK, Appellee.

No. 3650.

Court of Civil Appeals of Texas.

Waco.

Sept. 10, 1959.

Rehearing Denied Oct. 1, 1959.

Magus F. Smith, McAllen, Rawlings, Sayers, Scurlock & Eidson, Fort Worth, W. H. Wren, Hamilton, J. P. Rice, Dallas, H. B. Gordon, Hamilton, for appellants.

Abney, Hammett & Lynch, Lampasas, H. W. Allen, Truman E. Roberts, Hamilton, for appellee.

TIREY, Justice.

This is a suit in trespass to try title. At the conclusion of the testimony the Court overruled appellants' motion for peremptory instruction and submitted six issues to the jury. Since the jury, under the Court's instructions, did not answer issues two and three, we quote substantially only issues one, four, five and six:

"(1) Do you find from a preponderance of the evidence that James A. Eidson, either in person or through a tenant or tenants, or partly in person and partly through a tenant or tenants, held exclusive peaceable and adverse possession of the land in controversy in this suit, cultivating, using and enjoying the same continuously, for any period of ten years or longer after July 5, 1940 and prior to his death in 1954? A. No.

"(4) Do you find from a preponderance of the evidence that E. A. Perry executed and delivered the deed dated March 30, 1940, from himself to the Perry National Bank, with the intention of vesting in said Perry National Bank all the right, title or interest in and to the land in controversy that was formerly owned by James A. Eidson and deeded by him to E. A. Perry by deed dated November 5, 1931, and for the purpose of foreclosing thereon in behalf of said bank? A. Yes.

"(5) Do you find from a preponderance of the evidence that the Perry National Bank at any time during or prior to the year 1946 applied the stock in Eidson Club Lake, a corporation, (assigned by James A. Eidson to said Bank on November 3rd, 1931) to the extinguishment of a debt or debts owing said bank by said James A. Eidson? A. Yes.

"(6) Do you find from a preponderance of the evidence that James A. Eidson knew, or in the exercise of ordinary care should reasonably have known of such application of such stock to the extinguishment of such debt or debts on or prior to April 9th, 1952? A. Yes." (Appellee made no exceptions to the Charge nor did it ask for the submission of any other issue.)

The Court overruled appellants' motion for judgment non obstante veredicto and granted appellee's motion for judgment. Pertinent to this discussion the judgment decreed that the Perry National Bank recover of the plaintiffs and the cross-defendants, naming them, an undivided 443/500ths interest in the 600 acre tract of land describing it by metes and bounds. The judgment further decreed that the bank recover from plaintiffs and cross-defendants, naming them, and other parties not pertinent here, the title to and possession of 443 shares of common capital stock

of the Eidson Club Lake, a corporation, as well as certificates evidencing the same, and decreed accordingly. The judgment taxed all costs against plaintiffs and cross-defendants. Appellants assail the judgment on 24 points. We have grouped them into the following: (1) Since the evidence shows without dispute that the deeds in question and the stock were given in one transaction by Eidson to the bank for the purpose of securing his indebtedness to the bank, that such transaction created the relationship of mortgagor and mortgagee, and that such situation continued until it was proven otherwise; (2) Since the evidence shows that there was no foreclosure on the land or stock the relation of mortgagor and mortgagee continued to exist at all times between Eidson and the bank, and such relationship existed when appellants filed their suit; (3) That the jury's answer to issues 1 and 4 do not support a judgment in favor of the bank; (4) That the answers of the jury to issues 4, 5 and 6 are not sustained by the evidence, and that the answer to each of said issues is so contrary to the overwhelming weight of all the evidence as to be clearly wrong and unjust and will not sustain the judgment of the court.

■■■ It is our view that since the plaintiffs grounded their cause of action on the theory that the deeds and the stock were given by Eidson to secure his indebtedness to the bank, and since the bank admits that it accepted the deeds and the stock certificates as security of Eidson's indebtedness, that plaintiffs thereby made out a prima facie case to the effect that they were entitled to pay the debt and have title quieted in them, and that such undisputed factual situation voided the bank's claim that title had passed to it under the deeds, or that it had title to the stock. This we understand to be the Rule announced in King v. Hill, 138 Tex. 187, 157 S.W.2d 881, points 1, 2 and 3 (Comm. of App., opinion adopted;) same cause 141 Tex. 294, 172 S.W.2d 298 (Comm. of App., opinion adopted) see points 1 to 4, pages

299–300. The Court, in the foregoing case, made this statement of the Rule [138 Tex. 187, 157 S.W.2d 883]:

"By proving that the purported deed was in fact a mortgage they rebutted or avoided the claim of defendants in error that title passed to them under said purported deed."

In the case at bar in addition to the proof of plaintiffs, defendants admitted the transaction to be a mortgage. We think the Rule in Texas is that once an instrument or transaction is established as a mortgage that such condition is presumed to continue to exist until proven otherwise. Judge Smedley in Martinez v. Gutierrez, Tex. Com.App., 66 S.W.2d 678, 684, point 9, stated it in this manner:

"It is also true that a law or a condition once proven or known to exist will be presumed, in the absence of evidence to the contrary, to have continued in effect."

See also statement of the Rule by Judge Holmes in Humble Oil & Refining Co. v. Sun Oil Co., 5 Cir., 191 F.2d 705, pt. 17 at page 715, certiorari denied 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687, in a trespass to try title suit. Under the foregoing authorities it is obvious that since plaintiffs plead and proved, and the bank and its attorney admitted that the deeds and the stock were given in the same transaction to the bank to secure Eidson's debt, that the plaintiffs discharged their burden because they plead that they were willing to pay the debt with interest, and were entitled to have the title to the property quieted in them. See also T.J. 29, Mortgages, Secs. 20 and 21, pages 813–814, and authorities there cited. That leads us to say that under the authorities heretofore cited and since no judicial foreclosure is shown, the judgment of the trial court cannot be sustained on the jury's answers to issues 1 and 4. See Humble Oil & Refining Co. v. Atwood, 150 Tex. 617, 244 S.W.2d 637, 640; Whitaker v. Hill, Tex. Civ.App., 179 S.W. 539; Ullman v. Dev-

ereux, 46 Tex.Civ.App. 459, 102 S.W. 1163 (writ ref.).

Can the judgment of the trial court be sustained on the answers of the jury to issues 5 and 6, or either of them? We think the answer is "No."

A statement is necessary. On November 5, 1931, Eidson executed a deed to Perry, the bank president, and the Eidson Club Lake executed a deed on the same date to the bank, both deeds purporting to convey the land in question. At the same time Eidson placed his Eidson Club Lake stock certificates with the bank, and on November 6, 1931, the bank's Combined Customer's Statement-Liability Ledger showed that Eidson executed Note No. 5480, dated November 5, 1931, in the sum of $7,660.44, payable to the bank on May 5, 1932. This indebtedness was carried forward and renewed from time to time until April 1, 1945, at which time it was renewed by note for $5,488.50, payable to the bank 12 months after date on April 1, 1946. Testimony was tendered to the effect that Mr. Manning, President of the Bank, agreed with Joe H. Eidson, Jr., that at the time of James A. Eidson's death on January 13, 1954, that he owed the bank on such indebtedness $6,378.-30. The note dated April 1, 1945, among other things provided:

"In the event of non-payment of this note when due, we, and each of us, hereby authorize the holder of this note *to sell* any collateral security attached hereto, assigned, transferred or deposited with the said The Perry National Bank, or its assigns, and *such sale* may be either public or private, and without notice or legal proceedings, to make any transfers that may be required, and the proceeds arising therefrom to be applied to the payment of this note, hereby ratifying and affirming all that may be done by virtue hereof."

This note of date April 1, 1945, had the following credits:

"1/11/50, paid $600.00"

"2/50, paid $600.00"

Testimony was tendered to the effect that these credits were from oil and gas leases that the bank had executed on the land, and that it was the bank's contention that they did not represent credits on Mr. Eidson's indebtedness to the bank but. they made the notation for their convenience in dealing with other stockholders who had an interest in the land because the corporation was defunct. There is a total absence of testimony to the effect that the bank made an accounting of such credits to the other stockholders. Mr. Manning further testified to the effect that he had been connected with the bank since 1928 with the exception of a period from about April 1942 to April 1946, during which time he was with the Examination Division of the Federal Deposit Insurance Corporation; that he had been President of the bank since January 1, 1958. With reference to the deed that Eidson gave to Perry, he said: "I think that the purpose of that was to place title to that property in Mr. E. A. Perry as the agent of the Perry National Bank to secure payment of some money that Mr. Eidson owed the bank at the time."

"* * * Q. Now Mr. Manning, I believe your attorney said yesterday that at the same time these deeds were made and the notes were made, Mr. Eidson turned over some stock to the bank. Is that correct? A. That's right.

"Q. And you agreed with that statement? A. Some notes were made and some stock was turned over to the bank.

"Q. *Yes, the stock was the same transaction with the notes and the deeds; is that correct?* A. *That's right.*

"* * * Q. When did the bank own this property to such an extent that Mr. Eidson didn't have a right

to buy it back? A. *I don't think I would be able to give you a definite date on that.*

"Q. Then was there a formal foreclosure or anything like that on this property? A. No.

" * * * Q. Did you ever notify *Mr. Jim Eidson,* or did anybody in the bank ever notify *Mr. Jim Eidson that he didn't have any right to repurchase that property?* A. *I couldn't say.*

"Q. *You never did, yourself, did you?* A. *No.*"

Mr. Joe Cleveland testified by deposition to the effect that he was 67 years of age; chairman of the board, resided in Hamilton County, and that he had been employed by the bank since 1920, at which time he started as cashier; that he became president in 1950, after the death of E. A. Perry, February 10, 1950, and that Mr. Perry was president of the bank at the time of his death; that he had a conversation with Mr. Eidson after the death of Perry, and he had in all two or three conversations, one of them shortly after the death of Mr. Perry, two of them were in the bank and one of them was in front of the bank.

"Q. State as best you can what you said to Mr. Eidson on each of said occasions? A. * * * I don't remember what I said to him when he said he was glad we had leased our land, but on the last conversation, I do remember I was in front of the bank, and when I met him he told me he hoped we would not see fit to sell the land now. That was shortly after Mr. Perry's death. And I told him we would not unless we were forced to."

Mr. Cleveland further testified to the effect that he had no personal knowledge of any transaction between Mr. Perry in behalf of the bank and Eidson relative to the conveyance of 600 acres of land to the bank, or the transfer and delivery of the corporate stock in the Eidson Club Lake to the Bank.

Mr. Cleveland said: *"That was a transaction strictly between Mr. Perry and Mr. Eidson,* but I knew the land had been conveyed to us and the stock, too."

"Q. If you have any personal knowledge of any transaction inquired about in the next preceding question, please state what your knowledge is with respect thereto as fully as you can? A. Mr. Eidson got his debt for the deed. I know of my own knowledge that after the deed the bank did not hold an enforceable note against Mr. Eidson, and it was up to him as to whether or not he would renew the note, and he did not renew the note. When Jim quit renewing the note, we considered the land was ours.—By that I mean the bank so considered it —the bank and Mr. Eidson both."

Mr. Joe Eidson, Jr., an heir and a party to the suit, testified to the effect that after his uncle's death that he had a conversation with Mr. Golightly and Mr. Wieser, who were members of the board of directors of the bank, and they advised him to the effect that the board of directors had never taken any action on the matter of his uncle's indebtedness to the bank. This testimony was not contradicted and is to the same effect as Mr. Manning's testimony. Needless to say Mr. Cleveland's statement to the effect that Mr. Eidson considered the land belonged to the bank is hear-say and a conclusion and has no probative force whatsoever and plaintiffs' objection to it should have been sustained. See Henry v. Phillips, 105 Tex. 459, 151 S.W. 533, point at page 538.

Honorable W. H. Wren, an attorney of the Hamilton Bar, testified to the effect that in late 1949 or 1950 his father bought a place south of the land in suit and that he examined the title to the land and in so doing he noticed a deed in the records from Mr. Eidson to the Perry National Bank; that he went to the bank and talked with Mr. Cleveland to ascertain if the bank was interested in selling the land and Mr. Cleve-

land said: "He stated that they didn't have anything to do with the land, and that I would have to see Mr. Eidson." Mr. Wren further testified to the effect that he talked with Mr. Eidson about the property before he died. He said: "Well, he came to me as an attorney there * * *. There was a controversy over what the balance was due against the land. I discussed that with him back and forth there for maybe a year or more before he died."

"Q. Mr. Wren, was he having any difficulty with the bank with reference to possession of the property? A. No."

The witness, Sims, testified to the effect that he lived in Hamilton County, and had ved near the 600 acre tract involved in the suit, and as he remembered it was from 1927 until about 1934; that he became acquainted with Mr. Eidson about 1922; that he worked for Mr. Eidson some ten or twelve years; that Mr. Eidson was operatting the gravel pit and that he was selling gravel from the pit, and that he knew he was selling it up until around 1944; that Mr. Eidson kept horses there on the property up until the time of his death; that he never saw anybody entering the premises without Mr. Eidson's consent, and that Eidson looked after the property closely; that he worked on the fences, broke horses and did many other jobs; that he worked for Mr. Eidson just a year or so before he died.

"Q. Did you ever know of the Perry National Bank or any of its officers or employees ever having anything to do with this land before Eidson died? A. No Sir, I didn't."

Mr. R. L. Perry testified to the effect that he lived in San Angelo, and that he was in the real estate business, and that he was engaged in said business in Hamilton from about 1946 to 1955, at which time he moved to San Angelo; that he had occasion to talk to Mr. Eidson about the land in suit; that Eidson came to him to see about a loan during the time that he was living in Hamil-ton about a year before Mr. Eidson died. He said: "He wanted me to see if I could get him a loan on that place out there, so I called John Hancock's man, Emmett Edwards, and he came up here, and Jim met us out there at the place, and we went over it, and that's just as much as I can tell you * * *."

The Honorable H. B. Gordon, an attorney, and we think at least a disinterested witness, testified to the effect that in the latter part of 1946, Mr. Eidson requested him to draw a lease contract involving 1,000 acres of land near Hamilton, and that it included the 600 acres involved in this lawsuit. Mr. Gordon said: "Mr. Jim came by the office pretty early one morning and told me he wanted me to draw a lease contract between him and Brown and Maddox, told me what he wanted in it, and told me what the property was. It was the south— I believe it was the south thousand acres of the 1200 acre tract. He didn't lease the cultivated land—seemed like it was about 200 acres or 190 acres of cultivating land down there. He told me what he wanted, and the next morning as he started to his ranch he came by and read it, and then is when we put the initials in there, and that's in the handwriting of Miss Tatum, and he instructed me to—He signed it and instructed me that Mr. Brown and Mr. Maddox would be up and sign the contract and for me to have them to leave the check with me. * * * That's all I believe he told me all the instructions he gave me. * * * Later on, through the day, Mr. Brown and Mr. Maddox came up and executed the instrument." The lease in question had the following provision in it:

"It is further agreed that the Party of the First Part shall have the right to go upon said tract of land at any and all times that he wishes, and shall not be restricted in any manner—any way or manner in operation of said gravel and sand pits, and Eidson Lake property, and to cultivate the 100 acre field, that are located and situated upon

said tract of land herein leased to Party of the Second Part."

Needless to say the party of the First Part is Mr. Eidson.

" * * * A. Now, as I read this —it's been a long time—I left something out. The morning he came down and signed it and read it, and we just pencilled it in: 'It is further understood and agreed that Lessor reserves for'—No. No, I'll take that back. This right here was not a part of the contract. This pencilled in part here was not a part of this contract, for the simple reason I left it out, then in '48, when I drew the contract he called it to my attention, said he wanted it just exactly like this contract was, and he brought the contract to me and I pencilled it in here and just turned it over to the girl, told her to change the dates on it, and we wrote the contract for 1948. * * *'

"Q. Mr. Gordon, did you get a check for that—thousand dollar check? A. Yes, Sir.

"Q. All right, who was that check made payable to? A. It was made payable to Mr. Eidson.

"Q. At that time did you check with Mr. Perry at the Perry National Bank about how the check should be made payable to? A. Yes, I did.

"Q. Who did Mr. Perry say to make the check payable? A. He told me to make it payable to Mr. Eidson."

Dr. Charles C. Baker, a practicing dentist, testified to the effect that he had lived in Hamilton for 56 years, and that he had been engaged in the practice of dentistry for 33 years, and that he knew Mr. Eidson during his lifetime; that he was acquainted with the land involved in the lawsuit; that he was also a member of the Eidson Club Lake; that sometime during the late forties he had occasion to talk to Mr. Eidson about his selling 1,200 acres.

"Q. What did you talk to him about? A. Mr. Randle, Tullos Randle, Randle Brothers in Hico, asked me if I was a good friend of Mr. Jim's and I told him I thought I was, and they asked me, Mr. Tullos did, to make a bona fide offer of $25,000 for the lake and the easements around the lake so they could get in and out—that's all he wanted was the lake property and enough land around it for easements, I guess you'd call it that—and which I did and Mr. Jim refused it, he laughed at me.

"Q. What did he tell you? A. Well, he just said he wasn't interested, he said he could make more money out of it the other way.

"Q. And about when was that? * * * A. Well, it was about '45 or '46.

" * * * Q. Well, now, did you ever talk to Mr. E. A. Perry? A. Yes, sir.

"Q. About this thing? A. Yes, sir. Mr. Perry was a patient of mine and my father, and after my father passed away I inherited him, you might say, he didn't want anybody else but me or my father to look at his mouth. And he was in the office a little while after this happened, and then is when I talked to him.

"Q. What was the nature of your conversation then? A. Well, he didn't need anything done to his mouth and that's the reason I can't give you the exact date, because I didn't make a record of him being there, * * * because I did no work for him. And I told him of the conversation I had with Mr. Randles, and Mr. Jim, and he laughed, he said, 'Well', he said, 'I don't see why Jim didn't do it.' He said, 'He don't owe the bank much.' I thought he owed the bank a whole lot, just left that impression with Mr. Ed Perry, and Mr. Perry said, 'No,

he doesn't owe the bank too much. We just hold a deed of trust on it.' And that's practically all the conversation I had about it."

There is much testimony in this record concerning the way that Mr. Eidson handled this property up until the time of his death, and we think that the great preponderance of the evidence is to the effect that Mr. Eidson was using, occupying and controlling the same—he was pasturing his horses and. cattle on the property—he was selling gravel-making leases and exercising control over the property.

As we understand the record there is a total absence of direct testimony to tender an issue to the effect that the bank at any time made a public or private sale of this pledged stock, or that the bank applied the stock to the extinguishment of the debt. The next question that presents itself is: What facts and circumstances of probative force are shown in the record to tender this issue? In reviewing the testimony applicable, we are bound by the following Rule: "To establish a fact by circumstantial evidence, the circumstances relied on must have probative force sufficient to constitute the basis of a legal inference; it is not enough that they raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. The circumstances relied on must be of such a character as to be reasonably satisfactory and convincing. At all events they must not be equally consistent with the nonexistence of the ultimate fact." See Big Three Welding Equipment Co. v. Reeh, Tex.Civ.App., 301 S.W.2d 504, 506. (N.W. H.) Point 6 and for collation of authorities. Going back to Issue 5, it specifically inquires if the bank applied the stock to the payment of the debt "at any time during or prior to the year '46." So, the exact question here before us is: Where are the facts and circumstances that support the jury's answer to Issue 5? It is without dispute that the last note that Eidson issued to

the bank was in April 1945, and due April 1, 1946. We think the evidence conclusively shows that Eidson was exercising dominion and control, using and enjoying the tract in question during the time inquired about in this issue and certainly at all times prior thereto. *There is certainly a total absence of any fact or circumstances in the bank's records to sustain the jury's answer to this question.* As we understand the testimony of Mr. Manning, the President, the bank makes such admission. Assuming, but not deciding, that the testimony of Mr. Cleveland has probative force, he said: "Mr. Eidson got his debt for the deed. I know of my own knowledge that after the deed the bank did not hold an enforceable note against Mr. Eidson, and it was up to him as to whether or not he would renew the note, and he did not renew the note. When Jim quit renewing the notes, we considered the land was ours—By that I mean the bank so considered it. * * *" Mr. Cleveland's testimony reflects his opinion on the legal result of the dealings of Mr. Perry as President of the bank to and with Mr. Eidson, the details of which he had no personal knowledge. We think his view is grounded solely on the fact that the bank had a deed to the property. Our view is that his testimony is without probative force on the issue that the bank applied the stock to the payment of the debt. Bearing in mind that Eidson's note was not due until April 1, 1946, the bank could not legally apply the stock to the payment of the debt until after the note matured. Where are the facts and circumstances to show that the application was made between April 1st, and December 31, 1946? Bearing in mind the long friendship and close relationship that existed between Perry and Eidson, it is not consistent with this record and all the surrounding facts and circumstances that Perry did apply the stock to the payment of the debt or that he did notify Eidson that he had done so. Moreover, since the record wholly fails to show any demand for payment made by the bank or Mr. Perry on Eidson for his note, and wholly fails to show that

any credit was given by the bank to Eidson's debt at the time the bank claims that the stock was applied to the payment of Eidson's debt, we think the jury's answer to Issue No. 5, in view of all the facts and surrounding circumstances, is highly inconsistent with the friendship and close relationship that existed between Eidson and Perry and that such facts and circumstances under this record as a whole do not support the jury's answer to Issue No. 5. Going back to the testimony of Mr. Manning and Mr. Cleveland, we think their testimony falls within the Rule announced by this Court in J. R. Watkins Co. v. King, Tex.Civ.App., 83 S.W.2d 405–407, (N.W.H.) where this Court made this statement:

"* * * When a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony and cannot successfully complain if he is non-suited or the court directs a verdict against him." See Points 2 and 3 and authorities there collated.

Our Supreme Court cited, applied and followed the foregoing doctrine in Stanolind Oil & Gas Co. v. State, 136 Tex. 5, 145 S.W.2d 569, point 1. It is without dispute that this entire transaction between Eidson and the bank was handled by Mr. Eidson and Mr. Perry until Mr. Perry's death in 1950. We have examined the entire record to the best of our ability and we are of the view that there are no circumstances of probative force to constitute the basis of a legal inference to the effect that Mr. Perry as an officer of the bank during 1946 or prior thereto applied the stock certificates pledged by Eidson to the payment of his debt to the bank. We have some doubt as to whether such facts and circumstances raise a surmise or suspicion to the effect that Perry in the exercise of his duties as an officer of the bank applied the stock to the payment of Eidson's debt. It is not claimed that any other officer of the bank did so. Our view is that the circumstances tendered and relied on in this record are not reasonably satisfactory and so convincing as to sustain the jury's verdict in this behalf. Moreover, we think the jury's answer to Issue No. 5 is so contrary to the overwhelming weight of all the evidence as to be clearly wrong and unjust under the doctrine announced in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660. What we have just said we think applies with equal force to the jury's answer to Special Issue No. 6.

Being of the foregoing view this will require this cause as to appellants to be reversed and remanded. The trial court is further directed to determine the amount of the indebtedness owing with legal interest.

But appellee contends that appellants are estopped and are bound by the recitals in the boundary agreement executed by the bank and Eidson under date July 5, 1940. We think there is some significance to the fact that the deed from Eidson to Perry dated November 5, 1931, was not recorded until April 1, 1940. After the boundary agreement was recorded Eidson obtained a reamortized loan secured by lien on 590 acres adjacent to the 600 acre tract in controversy. In connection with this loan transaction, a boundary agreement was executed by Eidson and appellee, acting by Perry. This agreement, acknowledged and recorded July 5, 1940, recited that Eidson was the owner of 590 acres, described by metes and bounds; and that the bank was the owner of the 600 acre tract involved in this suit. This agreement further recited that "the 600 acre tract owned by the Perry National Bank adjoins the * * * land owned by J. A. Eidson" and "a fence apparently separates said lands, but actually does not separate them, but lies wholly upon the land of the said J. A. Eidson;" that the bank and Eidson desired to enter into

a boundary agreement consistent with the field notes "describing their respective lands." The instrument concludes, "It is expressly understood and agreed that Perry National Bank claims only the lands described in the field notes for said 600 acre tract, and the true boundary line separating its lands and those belonging to J. A. Eidson" has a defined course:

This agreement was executed nearly three months after the recording of an oil and gas lease executed by the bank as sole lessor, covering the 600 acres. There is evidence to indicate Eidson thereafter managed and operated the 600 acres for the bank, with his adjoining 590 acres, paying the revenues from the 600 acres to the bank. The bank executed subsequent leases covering the 600 acres before Eidson's death, and received rentals and bonuses for its account. It is true that the bank rendered the property and paid the taxes thereon for a period of time, but evidence was tendered to the effect that this was done for convenience. It is true that there is persuasive basis for appellee's contention that appellants are bound by the recitals in the instrument whether considered as a muniment of title or as a basis for estoppel. However, we are of the view that since the record is without dispute that Eidson continuously renewed his notes to appellee for five years after the execution of the boundary agreement with the bank, and because the rents and revenues from the property were apparently applied as a credit to the renewal notes—that such undisputed factual situation shows that the boundary agreement was executed solely for Eidson's benefit in order that he might obtain his loan on the 590 acres. In all events we think the great weight and preponderance of the evidence under all the facts and circumstances sustains the foregoing view. We are of the view and so hold that the recitals in the boundary agreement are not so conclusive that they will sustain the judgment of the trial court. We have carefully considered each of appellants' points and insofar as they are in harmony with the

views here expressed they are sustained; otherwise, they are overruled.

Since the decree specifically provides that the bank have and recover title to the property, on its cross-action describing it, "together with possession of said land for itself and in behalf of the owners of an undivided $5\frac{7}{100}$ths interest in said land," requires that this part of the decree be also reversed and remanded.

Since the Honorable W. H. Wren filed a disclaimer the decree providing that he take nothing, is affirmed.

The judgment, insofar as it decreed that C. L. Lynch, his heirs and assigns, own an undivided Five Five Hundredths ($5\frac{5}{100}$ths) interest in the land in suit, is in no wise disturbed.

The decree, insofar as it awards an undivided $\frac{1}{600}$ interest in the real estate to E. A. Perry, J. M. Williams, C. B. James, F. C. Williams, A. R. Eidson, W. P. Huddleston, C. R. Taylor, J. M. Livingston, T. C. Pierson, G. M. Carlton, W. T. Bolding, C. E. Chandler, H. J. Fowler, C. C. Cleveland, Jake Evans, Haskell Harelik, W. P. Lawson, V. A. Hartman, C. C. Baker, A. H. Williams, R. A. Kooken, Craik Pierson, H. M. Wieser, William Lemmons, Fred Graves, Alice McGarvey, Robert L. Maxwell, Ted Chesley, D. B. Beach, Harry Boynton, R. D. Foster, Q. Brunk, J. M. Williams, Jr., Gus Huddleston, O. D. Henderson, P. L. Maxwell, Johnie Johnson, C. M. Rush, T. M. Mitchell, W. A. Patterson, John R. Eidson, Joe H. Eidson, L. Brann, J. D. Koen, W. B. Claunch, H. L. Applewhite, J. T. James, J. C. Shipman, T. A. Emmitt, R. H. Miller, A. T. Jones, and H. L. Miller, is in no wise disturbed.

The decree, insofar as it fixes a fee of $350 to be paid to the Honorable H. B. Gordon for his services as attorney appointed by the Court to defend the interest of the class-defendants, is in no wise disturbed, except that one-half of such fee is taxed against the plaintiffs, and the other one-half against the appellee bank.

All costs of appeal are taxed against appellee bank.

Accordingly, the judgment is reversed and remanded in part, and affirmed in part.

WILSON, Justice (dissenting).

I am unable to record formal unanimity to this decision at the expense of strong conviction. I am in accord with the holding of my brethren on the question of "foreclosure" under the deeds. There is nothing in the record to show judicial foreclosure or transfer of the equity of redemption by any valid method. The deeds, though absolute on their face, were unquestionably mortgages.

This is not true, however, as to the corporate stock. It was pledged by Eidson to the bank. The rules governing the method of transfer of the equity of redemption applicable to realty do not apply to personalty. Apparently recognizing this, the majority have held the jury's answers to issues 5 and 6 are so contrary to the overwhelming preponderance of the evidence as to be manifestly unjust.

In order to reach this conclusion, I think the majority must of necessity commit a material error of law as to the party upon whom the burden of proof rests. This is a dual suit. It is a trespass to try title action; but it is also a suit for *title* to and possession of *corporate stock* which appellee has held under assignment for twenty-three years. As in the case of conversion or other actions involving title to personalty, upon the plaintiff

> "rests the burden of proving ownership of or right to possess the property involved. *This burden lies upon plaintiff throughout the entire trial. It does not shift* to the defendant upon the making of a *prima facie case of ownership* in the plaintiff." 42 T.J. p. 562.

The majority improperly shifts the burden upon the showing the stock was pledged. Therefore, the rule it adopts as to circumstances being equally consistent with existence and non-existence of facts requires affirmance of the judgment, since the plaintiff has the continuing burden of showing superior title to the stock. In this, according to the jury, he failed. The burden of proof is not properly on the defendant to show its right. As to issues 5 and 6, the majority has held the *defendant* has failed to discharge a burden which never rested on it.

The power of an intermediate appellate court to declare a jury verdict contrary to the overwhelming preponderance of the evidence is one which should be exercised with scrupulous restraint, for it is not ordinarily subject to review. The jury's answers to issues 5 and 6 present no situation such as to shock the conscience or indicate bias or obvious improper motive. A rational test for exercising the power is "would we, as a jury have to have been actuated by prejudice, sympathy or other incorrect motive in order to reach such a verdict?" Justice Garwood, 30 T.L.R. 803, 812. This case will meet no such test. The majority opinion points to circumstances which would have supported a negative answer to issues 5 and 6. The following is a summary of some of the evidence preponderating in support of the verdict:

(1) Defendant began the trial with the presumption that "possession of personal property is prima facie evidence of title to the property and the possessor will recover against the claims of anyone who fails to establish a better right in the property than that of the possessor." 33 Tex. Jur. Sec. 9, p. 942.

(2) After the deed from Eidson to Perry was recorded in 1940, and after the latter's conveyance to the bank, Eidson reamortized a loan secured by lien on 590 acres adjacent to the 600 acre tract in controversy. In connection with this transaction a boundary agreement was executed by Eidson and appellee, acting by Perry. This agreement recited Eidson was the owner of the 590 acres and the bank was the owner of the

600 acres involved in this suit. It recited the "600 acres owned by the Perry National Bank adjoins the land owned by J. A. Eidson"; that the parties desired to enter into a boundary agreement consistent with the field notes "describing their respective lands." It concludes, "The Perry National Bank claims only the lands described in the fieldnotes for said 600 acre tract."

(3) This agreement was signed by Eidson nearly three months after the recording of an oil and gas lease executed by the bank as sole lessor, covering the 600 acres in question. Bonus and delay rentals from this lease went to the bank and not to Eidson.

(4) Appellee executed subsequent oil and gas leases on the 600 acres before Eidson's death, and except for two payments in 1950 and one in 1945, received all bonus payments and rentals for its own account.

(5) After the execution of the boundary agreement, Eidson continued to manage and operate the 600 acres for the bank, along with his own 590 acres. He made grazing and other surface leases on the entire 1,190 acres, dividing the income into equal parts and paying one-half the revenue to the bank. This continued from 1946 to 1954 when Eidson died.

(6) The testimony of the witnesses Short, Sims, Smith, Alexander, Strickland and Allen dealt largely, if not exclusively, with circumstances and transactions occurring in 1946 or before and prior to the 1946 date fixed by the verdict. Some of the testimony clearly related to the 590 acre tract alone. The testimony of Gordon that the bank told him Eidson was "looking after" the land and managing it is clearly consistent with the conduct of the parties and the jury verdict.

(7) The testimony of Dr. Baker, quoted at length by the majority, dealt with transactions "in 1945 or '46," and does not militate against the jury finding as to application of the stock in April, 1946, after Eidson's last renewal note was due. The wit-

ness Wren was a party to the action and apparently participated as counsel during the trial. Sims' testimony dealt with events "up till about '44," a time not material under the jury finding. The testimony of Perry relating to a proposed loan is not inconsistent with the jury verdict because Eidson consummated the loan only on his own 590 acres, not involved in the suit. Mr. Gordon's testimony conforms to the conduct of the parties and the verdict, for the proceeds of the lease he prepared were divided "fifty-fifty" between Eidson and appellee. Smith's testimony dealt with the period "about '45 or '46." Alexander told of events "in '46, if memory serves me." Harper stated he paid pasture rental on the total 1,190 acres "half and half" to appellee and Eidson. He testified Eidson told him about his financial difficulties and "when the bank got the land."

(8) Several witnesses testified Eidson told them after 1946 the bank owned the 600 acres.

(9) In 1949 Eidson leased his 590 acres and at the same time the bank separately leased the 600 acres.

(10) In 1950 Eidson told Mr. Cleveland, after appellee, as sole lessor executed an oil and gas lease on the land in question, that he was glad the bank had leased its land and was glad to see appellee get something out of it.

(11) In 1946, in a transaction concerning another tract of land with one Grisham, the circumstances clearly showed Eidson regarded the land in question as belonging to the bank.

(12) The bank permitted Eidson's note, due in 1946, to become barred by limitation—the only case in which it had ever permitted this to occur—charged the note off; and then, according to Manning, had difficulty in determining whether to carry the corporate stock or the real estate on its books under banking regulations. He testified appellee had the stock in its control and claimed ownership. He testified

there was never any disagreement or misunderstanding between Eidson and appellee about the land or corporate stock.

(13) The jury returned a negative answer to the issue as to whether Eidson, either in person or through tenants, held adverse possession after 1940. This finding is admittedly supported by the evidence, and appellants do not challenge it.

(14) The witnesses Strickland and McAnelly testified they leased the land in question directly from appellee on separate occasions.

After 1946, the date fixed by the jury verdict, on or before which the pledged stock was applied to satisfaction of Eidson's note, the entire course of conduct of the parties shows Eidson treated the 600 acres as belonging to the bank.

The basic question of law on which I differ with the majority is in the construction of the pledge agreement by which the stock was placed as collateral. It *authorized* appellee to *sell* the security without notice or judicial proceedings at public or private sale. It did not, however, *require* a sale. There is nothing precluding application of the stock to satisfaction of the debt by *consent*. Appellant had the burden of vitiating appellee's acquisition of the stock. The evidence clearly supports the finding that the bank applied the stock with Eidson's knowledge and implied consent. Appellant, having the burden, requested no further issues, and under Rule 279, Texas Rules of Civil Procedure, there is evidence to support any omitted issues relating to the ground, deemed found in support of the judgment.

The majority overlooks the fact that the only two persons who could testify positively as to their dealings (Perry and Eidson) were dead long before the trial. They were intimate friends, were both organizers of the bank and obviously dealt with each other informally. It is apparent that frequently Eidson managed the 600 acre bank tract (as agent or tenant) and the 590 acres of his own, jointly and as a single tract, for their mutual advantage and convenience.

There is *nothing in this record* to even remotely *suggest* that Eidson ever *claimed possession or asserted any title* to the stock during the almost *quarter of a century* from 1931 until his death in 1954.

By showing ownership of 443 shares of the stock, appellee established title to 443/500 interest in the land, for which the trial court properly rendered judgment. Humble Oil & Refining Co. v. Blankenburg, 149 Tex. 498, 235 S.W.2d 891, 895.

The judgment should be sustained on another basis: The boundary agreement mentioned above, in which Eidson declared appellee owned the 600 acres in question, whether regarded as a muniment of title, or as a basis for estoppel or collateral concepts of ratification, abandonment or disclaimer and the like, was a solemn declaration by the parties and their privies in a recorded instrument of legal dignity, expressly negativing appellants' claim. By it, in my opinion, they are bound. Eylar v. Eylar, 60 Tex. 315, 320; Havard v. Smith, Tex.Civ.App., 13 S.W.2d 743, Syl. 1–3; Bennett v. Romos, 151 Tex. 511, 252 S.W.2d 442, 445; Matthews v. Houston Oil Co., Tex.Civ.App., 299 S.W. 450; Henderson v. Book, Tex.Civ.App., 128 S.W.2d 117, writ ref.; Greene v. White, 137 Tex. 361, 153 S.W.2d 575, 583, 136 A.L.R. 626; Williams v. Hardie, 85 Tex. 499, 22 S.W. 399, 401. The least that can be said of it is that it is clear, positive and affirmative evidence supporting the verdict and judgment.

The majority opinion states that it is thought the great preponderance of the evidence is to the effect that Eidson was using, occupying and controlling the property; and that the evidence conclusively shows that Eidson was exercising dominion and control, using and enjoying the tract during the time inquired about in Issue No. 5. The jury's answer to Special Issue No. 1 is not attacked by appellants. Appellants have presented no point that the an-

swer to Special Issue No. 1 was contrary to the overwhelming preponderance of the evidence nor, indeed, is there any assignment relating to this finding. Since our action has not been invoked with respect to this issue, I think it should stand as an additional basis for an affirmance. I would affirm.