**HIMES et al. v. HIMES et al.**

No. 12723.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 22, 1932.

Rehearing Denied Nov. 26, 1932.

McLean, Scott & Sayers, of Fort Worth, for appellants.

Clark & Clark, of Fort Worth, for appellees.

CONNER, C. J.

This litigation is between the children and heirs of G. W. Himes, deceased. G. W. Himes became non compos mentis about December 1, 1924, and continued so until his death on April 26, 1929. He died intestate, owning the following property, to wit: A promissory note for $910 executed by appellant J. M. Himes and secured by a deed of trust upon 60 acres of land hereinafter described; $1,044.60 cash in bank; several rent houses; and 40 acres of land.

The record shows that, from the time G. W. Himes became insane until the date of his death, appellant J. M. Himes took possession of the property specified and cared for his father. There was no administration, or necessity therefor, of the estate of G. W. Himes, and J. M. Himes during the period specified collected in rents from the houses that belonged to his father $810, and owed the further sum of $240 of rents on said 40 acres of land.

This suit was instituted by J. E. Himes and other brothers and sisters of appellant J. M. Himes for an accounting and partition of the property of their said father.

Appellant's evidence was to the effect that the moneys in bank and the rents received from the houses as above specified were used by him for the benefit and in the care of his father, and the appellees are not now and here complaining of this fact or seeking any recovery on account of said appropriation of the moneys in the care of their father. The vital issues now and here relate to the said note of $910 executed by J. M. Himes and the status of the 60 acres of land upon which the said trust deed rested. As to these items the appellant pleaded that his father had given him the promissory note for his care and attention to him, and that the 60 acres of land upon which the trust deed rested constituted a part of his homestead, and therefore was not subject to the lien of the trust deed.

Among other findings not necessary to mention in view of what we have already said, the jury, in answer to special issues, found that, in addition to the moneys in bank and rents collected from his father's rent houses, appellant was due as rents on the 40 acres of land mentioned $60 a year for the years 1925 to 1928, inclusive, aggregating $240, that appellant had not paid the promissory note for $910, and that the 60 acres of land securing it by deed of trust was not at the time of the execution of the note and trust deed appellant's homestead. Upon the verdict of the jury, the court entered judgment against appellant for the principal, interest, and attor-

ney's fees due upon said note, which aggregated $1,668.30, and found that this sum was secured by a deed of trust upon the 60 acres of land therein described, foreclosed the lien, found the properties were incapable of partition, ordered the sale of the 40 acres of land that belonged to the deceased, and divided and apportioned the proceeds to the respective parties in shares, of which no complaint is made, and of which, therefore, no detailed statement is necessary. From the judgment so rendered appellant J. M. Himes has appealed.

But two controlling questions are presented for our determination. The first is whether under the circumstances the court erred in excluding appellant's tendered testimony to the effect that his father had given to him the promissory note in litigation as alleged in his answer; second, whether the 60 acres of land upon which the trust deed rested was at the time of the execution of the note and trust deed a part of appellant's homestead.

While the assignment of error raising the question first stated is perhaps not sufficiently specific to require consideration, we have nevertheless concluded to dispose of it.

■ The appellant, after pleading demurrers and a general denial, presented the following special plea: "Further answering herein, defendant would show the court that the note in the sum of $910.00 mentioned in plaintiffs' second amended original petition has been fully paid and satisfied, as shown by the allegations hereinafter contained; and further, that the alleged lien created by the execution of a deed of trust on the part of this defendant on the 1st day of December, 1922, and the land described therein, as shown by said deed of trust (being the same land and premises mentioned and described in plaintiffs' second amended petition) and the description of said land mentioned therein, which is of record in the deed of trust records of Tarrant County, Texas, in vol. 176, page 307, is void and of no force and effect, for the reason that said property and premises so described in said deed of trust and against which said lien is claimed, was at the execution of said deed of trust, and is now, and has been during all of said intervening times, the homestead of this defendant and his family; that this defendant at the time of the execution of said deed of trust, and now, and during all of the intervening times, has been a married man, living upon said premises, using, enjoying and cultivating the same as a homestead in the support and maintenance of his family, which consists of his wife and two dependent children."

Upon the trial the plaintiffs, appellees here, called the defendant John Himes as a witness in their behalf, and he was interrogated by counsel for plaintiffs. In answer to questions in behalf of plaintiff, he testified that the signature to the deed of trust shown him was his; that he signed and executed it and got $910 in December, 1924. And he was asked the following question: "You have never paid that have you? Answer: No, sir."

In answer to further questions in behalf of plaintiffs, he testified: "That it was his signature to the deed of trust in controversy; that he had signed and executed the $910.00 note; that he had already owed his father something like half of the amount of the note; that his father filed the deed of trust. That after his father was stricken he drew some of the checks but he did not ask his father about all of them. That he had not paid his father any rent on the 40 acre farm since 1924."

Witness was also interrogated as to various other transactions and conversations by the plaintiff on direct examination which we do not think pertinent to the questions under consideration and which therefore need not be detailed.

After the lengthy direct examination, on cross-examination he was asked by his counsel the following question: "Q. He (meaning G. W. Himes) told you and your wife that he wanted you to have everything that he had? A. Yes, sir; he said they all had turned him down, and he wanted us to have everything that he had."

To this counsel for plaintiffs objected, and the court sustained the objection. Counsel for defendant excepted to the ruling, stating that: "This is their witness; they put him on the stand, on the witness stand, and this is an exception to the general rule."

Mr. Clark for plaintiffs: "We are not asking for any conversation."

Mr. Binion for defendant: "And we here now would like to prove what and show what he did say."

Defendant was thereupon examined by counsel for plaintiffs and the following appears:

"Q. And if you get the money now, when you sell your place, why then, are you not going to pay it? A. Not going to pay the note?

"Q. Yes. A. My father gave me the note.

"Mr. Clark: That was ruled out yesterday and he repeatedly makes that statement.

"The Court: You are instructed not to consider the answer of the witness, that his father gave him the note for any purpose."

Thus far it is plain that all of the testimony of the defendant relating to the alleged gift was voluntary, was properly excluded, and affords defendant no right to claim plaintiffs have relinquished the right granted them by article 3716.

On further redirect examination by counsel for plaintiffs, the defendant John Himes testified as follows:

"Q. He (meaning G. W. Himes) didn't have confidence enough that he didn't get you to come to town and sign up a deed of trust for this money that you were borrowing off of him? A. No, but he had mind enough to give it to me.

"Q. He had mind enough to give it to you; he took a lien on the land in order to see that it was paid, didn't he? A. Yes, sir.

"Q. And you came to town and signed up, and he took it over here? A. When he saw that I had kept him, he said, 'John, you can have it.' He said, 'John I will give it to you.' He said 'you and your wife can have everything I have got.' He said 'you are the only ones that will take care of me. They have all turned me down, and when you turn—'

"Q. You mean that your father told you that his daughter, Mrs. Reeves back there had turned him down? A. Yes, sir, she did, honestly.

"Q. Why didn't he mark that note paid, if he was going to let you have it; why didn't he mark it paid? A. He couldn't write at all.

"Q. He couldn't write; why didn't you get some witnesses in there to that? A. I never thought anything about it; I thought that he had a right to do what he pleased with his property.

"Q. You know that it was a cloud on the title, and after he died that it would have to be cleared up, didn't you? A. I never thought anything about that; I didn't know anything about any law suit.

"Mr. Clark: Now, he has volunteered statements as to what his father told him, and of course we are willing for it, if we can go in and show what the father said; otherwise we want the court to strike it out.

"The Court: Gentlemen of the jury: You will not consider for any purpose the statements made by the witness's father to him about the property."

No exception appears to have been taken to this ruling.

While the question may not be entirely clear, we have concluded to sustain the ruling of the court excluding appellant's testimony, to the effect that his father gave him the note in controversy.

Article 3716, Rev. Statutes, reads as follows: "In actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them as such, neither party shall be allowed to testify against the others as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party; and the provisions of this article shall extend to and include all actions by or against the heirs or legal representatives of a decedent arising out of any transaction with such decedent."

It is plain from a reading of the statute that parties as therein classified may not testify against others as to "any transaction with, or statement by" a decedent, unless called to testify thereto by the opposite party. The mere fact that the plaintiffs in this case called the defendant to establish the existence of the note and trust deed in controversy and had him detail conversations with his father, independent of and having no relation to the alleged gift of the note to appellant, will not relieve him of the statute's restrictive operation. The loan of money and the execution of the note and trust deed is entirely independent of the question whether or not it was later discharged in the way of a gift from his father. Appellant stresses the fact that plaintiffs' counsel inquired whether the note had been "paid," to which the witness answered, "No."

It is said in the case of Cook v. Baker, 45 S.W.(2d) 161, by section B. of the Commission of Appeals, that the Supreme Court's policy is to strictly construe the language of the article prohibiting testimony regarding transactions with deceased persons.

The term "payment" has a variety of meanings, but its primary means conveys the idea of a money transaction. See Howe v. Mittelberg, 96 Mo. App. 490, 70 S. W. 396. We find the following in Words and Phrases, First Series, Vol. 6, page 5249:

"The term 'payment,' in its legal import means the satisfaction of a debt by money, not by exchange or compromise, or an accord and satisfaction"—citing cases.

Again, it is said in Words and Phrases, First Series, vol. 6, page 5243, that: "The use of the word 'pay' might be consistent with an intention to make a gift, but, when used with reference to the discharge of an obligation, will not be held to be used with that intention"—citing cases.

The answer of the witness, therefore, should be construed as having its primary meaning and not in the sense of a discharge of the note by gift. Indeed, the answer of the witness, together with other answers hereinbefore detailed, indicates that the witness had in mind that by the use of the term "paid" the note had not been discharged by the payment of money; in other words, the witness himself distinguishes between a "payment" and a "gift." The term "payment" imports an act by the defendant with the legal owner or holder of the note, whoever he or they may be, and hence the answer of the witness that he had not paid the note does not necessarily require the conclusion that there was any transaction or conversation with the deceased, the father of defendant. It was held in the case of Haugen v. Johnson (Tex. Civ. App.) 282 S. W. 1115, writ dismissed, that the "holder of executory contract for sale and purchase of land is not, under Rev. St. 1911,

art. 3690, precluded by death of grantees from testifying that contract notes were never paid."

Hence, as we view the question, no transaction" or "conversation" of 'any character was developed by that answer.

This court, in an opinion by Associate Justice Dunklin in the case of Huggins v. Myers, 30 S.W.(2d) 565, 567, approved the following quotation from Jones on Evidence, vol. 4, § 784: "The incompetency of the adverse party may also be removed by his being cross examined as to the transaction in question by the representative; and he is thereby rendered competent to testify to the whole of that particular transaction. The reason for this is obvious. The statute makes any person a party to or interested in the result of a suit incompetent to testify to conversation with deceased persons. * * * If he cross examines such a witness as to such conversations, so as to bring out a partial statement of any such conversations, he thereby waives the statute, and on redirect examination the witness is competent to give the whole of such conversation or qualify or explain the same."

We are not entirely agreed as to the effect of the questions by plaintiffs' counsel to defendant as to why the note was not marked "Paid," this testimony being noted above. However, a decision on this point is not imperative in view of our unanimous views as below set out. It will be noted from the excerpts above that, after said questioning, counsel for plaintiffs, being apparently uncertain of his situation under article 3716, moved the court to exclude the testimony as being voluntary, but offered in open court that the testimony remain before the jury, provided plaintiffs were allowed "to show what the father said"; i. e., develop their side of the father's statements regarding the giving of the note to defendant. This right he undoubtedly had if he had opened the matter by questioning defendant. To this proposition the defendant was silent. The court thereupon excluded the testimony, and defendant made no objection, nor took any exception to this final ruling. Apparently, at least, counsel for defendant agreed with plaintiffs' counsel and the court that those questions and answers last quoted did not relieve defendant of the silence imposed by article 3716. Acting thereon, the parties and the court excused the defendant from the stand and proceeded in trial. Several times thereafter counsel for defendant, when defendant was later returned to the stand, asked him questions approaching this matter of the deceased having given defendant the note. Each time plaintiffs' counsel objected and was sustained by the court. On none of those rulings did the defendant reserve any exception, nor does he bring any of this matter forward in his brief. It is plain, therefore: (1) That the parties have tried their case on an agreed

theory of presentation as far as this matter is concerned, and this court should adopt that theory and dispose of it accordingly; (2) we are in accord that nowhere, after any serious question arose that plaintiffs had relieved defendant of the prohibition of article 3716, did the defendant save any exception to the court's refusal to allow him to detail transactions or conversations with the deceased as to giving the note to defendant. Either of these grounds is sufficient reason upon which to overrule the assignment.

To this it may not be inappropriate to add that there is no evidence referred to showing that the father of the parties to this suit either before or after his insanity was affected with any other disease or malady requiring the services of a physician, hospital fees, or special efforts required for his proper care, and that a mathematical calculation of the amounts of moneys on hand and rents received and appropriated by the defendant will show that he received for the 4½ years his father lived after his mental incapacity about $37 a month for the care of his father, and, if to this we add the $240 of rents due from the defendant to the estate of his father and the amount due upon the promissory note in question, aggregating $1,558.38, it would amount to about $67 a month for such care.

The further question relating to the issue presented in the pleadings of whether the 60 acres of land upon which the deed of trust rested were defendant's homestead was disposed of in the trial court in harmony with the jury's answer to the fourth special issue. This issue, together with the answer of the jury thereto, reads as follows: "Was the 60 acres of land described in the deed of trust introduced in evidence the homestead of John Himes and his family at the time he executed said deed of trust on the first day of December, 1922? Answer: No."

The trust deed described the 60 acres in question, and among other things contains this recital, to wit: "The premises herein described is now my homestead, and has never been claimed, used or occupied as my homestead, the undersigned owning and occupying other property as his legal homestead."

■ The trust deed was signed by appellant alone, the wife not joining. The evidence shows without dispute that for many years the defendant J. M. Himes and his wife owned, occupied, and used as their homestead a tract of 109 acres of land, of which the 60 acres in question was no part. Later, and some time prior to the execution of the trust deed, J. M. Himes purchased the 60 acres which were situated across a road from the 109 acres which defendant and his wife occupied as their homestead. There

is a contention to the effect that the defendants are estopped from claiming the 169 acres as their homestead because of the recitation in the trust deed which we have quoted. In reading this quotation from the trust deed, it is apparent, we think, that the term "now" is a clerical error, and that for "now" the reading should be "not," otherwise the entire paragraph is in hopeless contradiction. While it is true that under a well-known rule of decision a like recitation in a trust deed may constitute an estoppel against a person not in the actual occupation of a claimed homestead, we do not regard the issue of estoppel in this case, for the record not only tends to show that the father, G. W. Himes, at the time of the execution of the trust deed and thereafter, was living with the defendant and his wife, and fully acquainted with the situation and with the use to which the 60 acres was subjected, but the record also undoubtedly shows that the issue of estoppel was pleaded by the plaintiffs, and it was not submitted nor does it appear that the plaintiffs requested a submission of it. It was therefore waived under the decision of Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084.

■■ Nevertheless, defendants having pleaded as a substantive defense that the 60 acres constituted a part of their homestead, the burden was upon them to prove it. Defendants insist that the evidence is wholly insufficient to sustain the verdict of the jury against them on this issue. The only evidence tending to support the issue is that of the defendant and his wife. Appellant thus presents it in his brief:

"Q. Well, why did you put in this deed of trust that you acknowledged before a notary public that it was not your homestead, and that you did not claim it? A. I never noticed that being in there.

"Q. When did you first claim that it was your homestead? A. When I paid for it.

"Q. When you paid for it. How came you to sign the instrument before a notary public, that it was not your homestead? A. I do not know that I signed that it was not.

"Q. You don't know that you signed that it was not? A. No.

"Q. Do you live on some property out of the southeast corner of the Rogers survey in Tarrant County? A. Yes, sir.

"Q. About 16 miles east of Fort Worth? A. Yes.

"Q. How long have you lived there, John? A. About twenty some odd years.

"Q. Have you and your family lived there all of that twenty years? A. Yes, sir.

"Q. You have been married during that time? A. Yes, sir.

"Q. Has your wife been living there? A. Yes, sir.

"Q. Is that the same place where you took care of your father? A. Yes, sir.

"Q. Have you or have you not supported your family out there? A. Yes, sir, I supported my family.

"Mrs. John Himes, the wife of John Himes, testified that she was the wife of John Himes; that she lived near Euliss in Tarrant county on a farm; that she did not know how large the place was, nor whether it was about 60 acres of land out of the southeast corner of the Rogers Survey in Tarrant County, Texas; that she had lived out there about 30 years; that the land was paid for; and that she had 5 children. That she thought they had about 169 acres out there. That the property she and John lived on was the only property that they own. That it was their home. That she had no other home. That they had always claimed it was their home and were still claiming it as their home. That they owned 169 acres which had been bought at different times; that they once owned 109 acres and later bought 60 acres. That she had lived on the 109 acres for some time before they bought this 60 acres. That they then went across the road and bought 60 acres more. That they didn't live on the 60 acres at all but it was connected with their farm, and that it was across the road. That their original homestead was on one side of the road and had the house and improvements on it, and years later they bought 60 acres across the road. That they had 109 acres in a tract of land to start out with, that had not been bought in one block but at separate times. That they started out with 40 acres and built that up to 109 acres by adding adjoining land to it; that she didn't remember when they bought the 60 acre tract. That they cultivated the 60 acre tract and used it and that it was under fence, and that the 109 acres is all one tract on one side of the road and the other 60 acres is on the other side of the road; that there was nothing between the 109 acres and the 60 acres but the fence and the road, and since they had acquired the 169 acres they had used same as their home and their farm, and that all of that tract of land was under cultivation, and that they had used and enjoyed and occupied the 169 acres as their home ever since they had acquired it."

Article 16, § 51, of our Constitution, in so far as applicable, provides that: "The homestead, not in a town or city, shall consist of not more than two hundred acres of land, which may be in one or more parcels. with the improvements thereon; * * * provided, that the same shall be used for the purposes of a home."

In construing this portion of the article of the Constitution, we here quote from the case of Autry v. Reasor, 102 Tex. 123, 108 S. W. 1162, 113 S. W. 748, opinion by Chief Justice Gaines of the Supreme Court: "In defining what shall constitute a homestead, section 51 of article 16 of the Constitution expressly provides that the rural homestead may be one or more parcels, but at the same time provides 'that the same shall be used for the purposes of a home, or as a place to exercise the calling or business of the head of a family.' It is clear, therefore, we think, before a homestead can be claimed upon land, it must be used for some one purpose of a home, either by cultivating it, using it directly for the purpose of raising family supplies, or for cutting firewood and such like. The alleged fact that the father of the defendants in error cultivated the tract in question, having been found against the defendants in error by the trial judge, we find no evidence that the land was used for the purpose of a home, other than that the proceeds were probably used in support of the family."

In view of the evidence, it will be noted that the defendant John Himes failed to state that the 60 acres in question constituted any part of his homestead at the time of the execution of the trust deed and note involved. The effect of this evidence was that it would be his homestead "when he paid for it"; and other evidence in the record shows that it had not been paid for at the time of the execution of the trust deed and note. It will be further noted that the only evidence that the 60-acre tract was ever used for any purpose was the statement of the wife "that they cultivated the 60 acre tract and used it, and that it was under fence, and that the 109 acres is all in one tract, on one side of the road and the other 60 acres is on the other side of the road; that there was nothing between the 109 acres and the 60 acres but the fence and the road and since they had acquired the 109 acres they had used the same as their home and their farm, and that all of that tract of land was cultivated, and that they had used and enjoyed the 109 acres as their home ever since they had acquired it."

No other witness testified to any character of use of the 60 acres. The statement of the witnesses that the 60 acres constituted their homestead is but a legal conclusion that must be supported by specific evidence of such character of occupation or use as will, under the Constitution, impress it with the homestead right. The mere cultivation of the 60 acres without proof that the crops raised thereon or the proceeds thereof were actually used for the purposes of the home is not conclusive.

Moreover, the only testimony in the record offered in support of defendant's plea of homestead is that of defendant himself and wife, and both are evidently highly interested witnesses. It has been held frequently that the testimony of interested witnesses, even though uncontradicted, only raises an issue of fact for the jury. See Stone v. City of Wylie (Tex. Com. App.) 34 S.W.(2d) 842, 845; Krueger v. Bankers Lloyds (Tex. Civ. App.) 45 S.W.(2d) 363; Wade v. First National Bank (Tex. Civ. App.) 263 S.W.(2d) 654, 656, writ dismissed.

In Stone v. City of Wylie, supra, the court held: "But, if it be conceded that the pleadings are sufficient in this respect, there is no evidence raising such an issue except that given by defendant in error. He being an interested party, his testimony, though not controverted, could do no more than raise the issue for the determination of the jury."

In Wade v. First Nat. Bank, supra, practically the identical question here presented was determined by the court, and doing so the court said: "Appellants also complain of the action of the court in submitting in his general charge issue No. 4 and the four special issues submitted at their own request, upon the ground that the finding of the jury upon those issues was contrary to the undisputed testimony. It appears that in the trial below an effort was made by appellants to prove that the Sessions tract of 101 acres, included in the written designation, had not been used for homestead purposes. The evidence offered in support of that contention is found in the testimony of Wade and his wife. Both of these were interested witnesses, and the court could not, in submitting the issues of fact, assume the truth of their testimony even though it was undisputed. Their credibility was involved, and became a matter for the jury to pass on. The written designation of the homestead, when filed and recorded as required by the statute, becomes at least prima facie evidence of what constitutes the family homestead; and, unless this is impeached because of some evasion of the law protecting the homestead, it becomes conclusive of that fact."

We are of the opinion, therefore, that the verdict of the jury on the issue of homestead, approved as it has been by the trial court, cannot be disturbed.

We find no other question raised by appellant's assignments of error which require discussion, and hence for the reasons stated all assignments of error are overruled, and the judgment below is in all things affirmed.

### On Motion for Rehearing.

■ Our attention has been called to the fact that the judgment below included attorneys' fees of 10 per cent. upon the note of $910 mentioned in the pleadings and in our opinion. It appears that there is no allegation in the petition of plaintiffs that the note provided for attorneys' fees, and there is no prayer for the recovery of attorneys' fees. The judg-

ment therefore is fundamentally erroneous to this extent, and it is ordered that the judgment be corrected so as to omit recovery of attorneys' fees. In other respects the motion for rehearing is overruled.