**Paul J. WATSON et al., Appellants,**

**v.**

**Wayne WATSON, Appellee.**

**No. 16152.**

Court of Civil Appeals of Texas.

Fort Worth.

Oct. 28, 1960.

Rehearing Denied Nov. 25, 1960.

B. T. Johnson and H. C. Ray, Fort Worth, for appellants.

Richard U. Simon and Richard U. Simon, Jr., Fort Worth, for appellee.

MASSEY, Chief Justice.

This is a will contest. Appellants were the proponents of the will, appellee

the contestant. The contest originated upon the proponents' offer of the will for probate. Therefore, under the provisions of the Texas Probate Code, Section 88, V. A.T.S., "Proof Required for Probate * *." (formerly Vernon's Ann.Tex.Civ.St. art. 3348), the burden was cast upon the proponents in the trial court to establish that the deceased was of sound mind and had testamentary capacity at the time his will was executed. 44 Tex.Jur., "Wills", p. 904, sec. 322, "Facts to be Shown in Order to Justify Probate", and p. 916, sec. 322, "Procedure—Pleading—Evidence". In answer to the special issue properly placing the burden of proof upon the proponents of the will, the jury returned as its answer, "He. (the deceased) did not have testamentary capacity." Based thereupon, the judgment entered was for the contestant. The proponents appealed.

Judgment reversed and remanded for a new trial.

█ It is believed important to the proper disposition of the instant case to consider the state of the law in Texas relative to "waiver" of a litigant's right to object to the introduction of all conversations and transactions with a decedent, otherwise afforded perforce V.A.T.S. art. 3716, the so-called "Dead Man's Statute", in an instance where the interested disqualified witness is taken on cross-examination by his adversary and asked questions concerning any conversation or transaction had with the deceased by the witness. The question is whether such interrogation as to one transaction on one occasion entitles the opposing party to interrogate the same witness, over objection, as to another and different transaction on another occasion. The annotator at 64 A.L.R. 1171 (supplemented in 107 A.L.R. 493 and 159 A.L.R. 424) cited the case of Grothaus v. Witte, 1888, 72 Tex. 124, 11 S.W. 1032, as an authority to the contrary of other Texas cases cited, but our analysis of that case leads us to the conclusion that the court's true holding was that under the circumstances of the matter under consideration, set out by the court, the admission of the testimony complained of could not have amounted to more than harmless error. This conclusion is fortified by our notice that Grothaus v. Witte was a Commissioners' opinion, adopted by the same Supreme Court which six months later (in Jackson v. Jones [Mumford's Executor], 1889, 74 Tex. 104, 11 S.W. 1061, 1063), stated that when a similarly disqualified witness was taken by the adverse party upon cross-examination and questioned upon a part of a transaction with a deceased he would then be entitled to testify in explanation of the whole transaction; "his evidence being then confined to the issues upon which he had been already examined."

The clearest statement of the law in Texas that we have found is in the case of Dannenbauer v. Messerer's Estate, Tex.Civ. App., Texarkana 1928, 4 S.W.2d 620, 626, affirmed Compton v. Dannenbauer, at 120 Tex. 14, 35 S.W.2d 682, 79 A.L.R. 1488, as follows: "Complaint is also made at the refusal of the court to admit testimony of Mrs. Dannenbauer in answer to an interrogatory propounded by her counsel on cross-examination. If Mrs. Dannenbauer, who was the proponent, when called as a witness by contestants had been interrogated as to a conversation occurring between her and the testator, she was a competent witness to testify on cross-examination as to all relevant statements made by the testator in that conversation. But she was not a competent witness to testify as to conversations and transactions about which she had not been interrogated by contestants." To the same effect are the decisions in Huggins v. Myers, Tex.Civ.App., Fort Worth 1930, 30 S.W.2d 565, writ dismissed; Himes v. Himes, Tex.Civ.App., Fort Worth 1932, 55 S.W.2d 181; and Wells v. Hobbs, 1909, 57 Tex.Civ.App. 375, 122 S.W. 451. Such is the Texas Rule stated to be in McCormick & Ray, Texas Law of Evidence, 2nd Ed., Ch. 6, "Competency of Witnesses", Topic 5, "Interest as a Disqualification",

secs. 332 and 333, "Statutory Disqualification of the Survivor of Deceased Opponent (Dead Man's Statute)—Waiver of the Disqualification—(1) Calling the Adverse Party as a Witness" and "—(2) Cross-Examination of Adverse Party." (See secs. 158 and 159 in 1st Ed.)

■ Because we have reached the conclusion that the contestant of the will in question, who prevailed in the trial court, was erroneously permitted, over objection, to testify about a particular conversation with decedent, and because we are of the further opinion that such amounted to harmful error under the contemplation of Texas Rules of Civil Procedure, rule 434,— the judgment should be reversed and the cause remanded to the trial court for a new trial. We do not find in the circumstances of the case that the proponents of the will "waived" their right to have the contestant's testimony about the conversation excluded.

The conversation between the contestant and the decedent, who was his father, was held in late 1955 or early 1956 according to the contestant. From other evidence in the record it would appear that it occurred at an earlier time, perhaps as early as late 1954. That matter is not too material. In any event it was on an occasion when no one other than the contestant and the decedent were present, and when the contestant, after visiting his sick mother in the hospital in Fort Worth, stopped by the decedent's home to visit with him. After some thirty minutes of conversation the decedent arose and made statements, including the following: " 'I want you to get out of this house and stay out. And I never want to see you again as long as I live.' " " 'You dadblame right, I know what I'm saying.' " " 'No, I'm not going to shake hands with you. I wouldn't put my hand in your hand and get my hand dirtied up that way.' " Further, contestant testified that the decedent "told me that I wasn't anything but a murderer and a killer, and told me to get out and stay out, that's exactly what he told me." Leading up to the questioning which elicited the testimony, contestant's counsel laid a predicate therefor by inquiry as to whether there was a reason, and what such reason might be, why contestant did not visit his father more often or ceased to visit him. It is noted from the record that there was no evidence from the contestant as a witness, that the decedent was of unsound mind, other than by inference that he was laboring under the delusion that contestant had murdered or killed someone. The evidence was undisputed that contestant had never been charged other than with minor traffic offenses.

It is apparent from the record that contestant had taken the part of his wife in connection with certain animosity arisen between her and his sister, a Mrs. Eulalia Cowan, initially described as having occasioned unpleasantness in the home of the decedent (and in his presence) on Christmas, 1950. Contestant and proponents of the will, Mrs. Cowan and Paul Watson, were the only children of the decedent. After Christmas, 1950, the visits of contestant in the decedent's home were more infrequent. It is not clear from the record, but apparently the contestant's wife ceased to visit altogether. In 1954 the decedent and his wife had a party in their home celebrating their "golden anniversary", to which contestant and his wife were invited but did not attend, although Paul Watson and Mr. Cowan called upon them shortly before such party was held and urged them to do so. The parties' mother was in ill health and from time to time was confined in a Fort Worth hospital after the occasion of the party and contestant frequently visited her when she was in the hospital, sometimes with his wife. Also, contestant did visit the decedent in his home from time to time in "drop by" visits.

The mother died on or about September 12, 1956, and on September 21, 1956, the decedent's will was executed. By this will the contestant was excluded as an heir of decedent's estate. Decedent died in April, 1959, following which proponents offered

his will for probate, said probate being contested in the Probate Court by the contestant. Appeal from that court was taken to the District Court of Tarrant County and from the District Court to this appellate court.

During the course of the introduction of the proponents' evidence a witness for them, Mr. Harnist, testified that the decedent had told the witness that contestant had been driven from the home. Thereafter as part of the contestant's case, contestant was placed on the stand and his counsel asked him if he had heard the witness, Harnist, so testify. Contestant answered in the affirmative, and was then asked, "Did your father say that in substance to you?" At this point proponents objected to contestant's testimony about the conversation, and the objection was sustained. For purposes of a bill of exceptions, the jury was excluded and contestant testified before the court substantially as heretofore outlined. Thereafter, following some immaterial testimony by contestant, he was taken on cross-examination by counsel for proponents, as follows:

"Q. Mr. Watson, you had some trouble in the Watson home on Christmas day in 1950, did you not? A. Well, trouble? What do you mean, sir, by trouble?

"Q. Well, wasn't there some disagreements going on in the Watson pertaining to your wife, and probably Eulalia Watson Cowan? A. No, sir, the disagreement—you want me to relate that to you?

*     *     *     *     *     *

"A. No sir, I'm not saying that. I am saying that I was ignored by my sister here. That day we walked into the kitchen, where we always would go, and I spoke to my sister; my daughter spoke to her and my wife spoke to her. And not until yet, sir, has she spoken to them. So far as that occasion is concerned.

"Q. That was Christmas, 1950? A. That's right, yes, sir.

"Q. And from then on you didn't visit in the Watson home for a year or two later, did you, after that occasion? A. Why I certainly did. I certainly did.

*     *     *     *     *     *

"Q. Now when was the next time you visited there? A. Well, I don't know, sir, I couldn't tell you exactly, but—

"Q. Well, was it a year later? A. Oh, sure, sure.

"Q. You visited your mother and father? A. Yes, sure. Less than a year later.

"Q. Well, you stayed away a long time, did you not, when you stayed away from the Watson home? A. Well, I certainly did after I was told to leave there, and not to come back.

"Q. Did Eulalia tell you to leave? A. No, sir. My dad told me that.

"The Court: Just a minute. The Court has ruled. I have made a ruling on that.

"Q. (By Mr. Johnson) Mr. Watson, did Paul Watson and Mr. David Cowan, your brother-in-law, come to see you and talk to you some time later after that incident on Christmas Day, 1950? A. Yes, sir, they sure did.

"Q. Came to your home? A. Came to my home, yes, sir.

"Q. And what were they trying to do, trying to bring about a reconciliation in ruptured relations in the family? A. Yes, sir, I think that that was the intention. That was just before the Golden Wedding anniversary of my mother and father, and we hadn't been over there, and I think they wanted us over there so they wouldn't have to do any explaining and so on. I mean partially that. I believe that my mother—

"Q. What year was that, Mr. Watson, that they visited you? You say the Golden Wedding anniversary, what year? A. If I'm not mistaken it was '54. I could be wrong about that but I believe that was '54.

"Q. In other words the feeling had been existing there since 1950 to 1954 when they came to see you, to see if they couldn't bring about normal relations in the family? A. Yes.

\* \* \* \* \* \*

"Q. Well was there any reason, if you had any difference with your sister, was that any reason for you not to visit your mother and father? *Why didn't you visit your mother and father more often?* (Emphasis supplied.) A. I did! I went to that hospital many times to see my mother and there in the home. I even brought some friends of ours that knew Mother and Dad, from Dallas, Texas, Mrs. Shannon for one.

"Q. I didn't ask you that. A. Well, all right, sir. You just wanted to know and I'm telling you.

"Q. And you didn't visit from January, 1951, until 1954. Did you visit your mother and father at all during that period of time? A. Well, now, what do you mean by 'all during that time'?

"Q. Did you visit them at all, did you visit them in their home? A. Yes, sir.

\* \* \* \* \* \*

"Q. And when Paul Watson and David Cowan visited you in Dallas, what year was that, was that 1954? A. I think it was, sir, in 1954, before this Golden Wedding anniversary.

"Q. And your wife was present there at that time, is that true? A. Yes, sir, she was, yes, sir.

\* \* \* \* \* \*

"Q. Now didn't Mr. Cowan, your brother-in-law, after your mother passed away September 12, 1956, didn't he get hold of you and ask you and your wife again to visit Mr. Watson, that is, after your mother passed away? A. He got hold of me and asked me?

"Q. You and your wife to visit Mr. Watson. A. No, sir. He did not.

"Q. He didn't contact you to come to see Mr. Watson after his wife passed away? A. No, sir.

"Q. He did not? A. No, sir. He did not.

"Q. Well, on the 50th wedding anniversary of your mother and father, did you receive an invitation to attend? A. I believe that we did.

"Q. Did you attend? A. No, sir, we didn't.

"Q. Why didn't you go? A. The reason that we didn't go? For the same reason that Your Honor here has objected to me answering, awhile ago.

"Mr. Simon: Now wait a minute. I think he has asked a question now. He has asked him a direct question to testify to this.

"The Court: I am going to address my remarks to Mr. Johnson. I have made a ruling.

"Mr. Johnson: Yes?

"The Court: That your question is inviting it.

"Mr. Simon: He asked it about three times.

"Mr. Johnson: Well, I'm not—I withdraw—I'm not inviting it, it was a different date, two years prior to that time, it has nothing to do with that transaction.

"Mr. Simon: It is the same thing, Your Honor.

"The Court: Wait a minute. We are going to get over our heads if we

don't look out and get into deep water. I have made a ruling. And it can be waived very easily. So you had better be careful.

"Mr. Watson: You want me to answer that?

"Mr. Johnson: No, I don't want you to answer.

"Mr. Watson: All right.

"Mr. Simon: I want to state to the Court now that I am going to re-offer this testimony.

"The Court: All right. We will pass on it when we get to it.

"Mr. Ray: Your Honor, there are two different dates involved here.

"The Court: Yes, I know that, Mr. Ray. But he asked why something didn't happen.

"Mr. Ray: That was two years prior to the time Your Honor ruled on.

"Mr. Simon: No, it isn't. It isn't two years prior at all.

"Mr. Johnson: It was 19— the wedding anniversary was, 1954–55 was the wedding anniversary.

"Mr. Simon: That is exactly what he was talking about a minute ago.

"Mr. Johnson: That is all."

Thereafter, when taken on re-direct examination the attorney for contestant obtained a ruling from the court that proponents had waived their rights to object to contestant's testimony concerning the conversation had with the decedent in which he was accused of being a murderer and a killer, and when he was ordered from the decedent's home. To all such evidence the proponents' objection was preserved.

There seems to be no question but that inquiry made by proponents' counsel of contestant as to matters which would amount to transactions with the deceased antedated the "golden anniversary" party

of 1954. The only question asked on cross-examination which might be considered to have related to the conversation that the contestant desired to have introduced in evidence was that which we emphasized in our quotations from the testimony, as follows: "Why didn't you visit your mother and father more often?" While contestant was testifying in answer to such question, it is clear that he did not consider the question to have relation to the occasion and conversation in question, and our own view of the evidence is that it had no relation thereto. Certainly the question directed to contestant as to why he had not attended the "golden anniversary" party, precipitating the discussion between counsel for the litigants and the court as to whether proponents had "waived" their right to stand on their objection to introduction of the conversation in question, could not have had any relation thereto for that party antedated the time when the conversation with the decedent was held. Furthermore, the question was withdrawn immediately when proponents' counsel became aware that the court was of the tentative opinion that it might constitute "waiver".

Our holding is that proponents, under all the circumstances of the case, were entitled to have sustained their objection to introduction of contestant's testimony about the conversation held with the decedent at a time after the "golden anniversary" party. It is not reasonably apparent from the questions asked and answers elicited from contestant that any inquiry into that conversation transaction had ever been opened. Where such a "waiver" is not reasonably apparent, it constitutes error for the trial court, over objection, to permit such testimony, for the disqualification of the witness cannot be said to have thereby been removed. Further, under the circumstances of this case harmful error is apparent and the judgment may not be affirmed under T.R.C.P. 434, it being highly probable that the mental delusion of the decedent had material effect upon the sub-

sequent testamentary disposition made of his estate to the exclusion of contestant. Testamentary capacity of the decedent was the ultimate issue in the case.

We have examined the additional points of error advanced by the proponents and have concluded that error is not presented by any of them. Therefore, they are severally overruled.

Judgment is reversed and the cause remanded for another trial.

BOYD, J., not participating.