338 F.2d 502
 Edwin K. ATWOOD, Alice B. Atwood, Richard W. Atwood, N.C.M.,
by Alice B. Atwood as his next friend and conservatrix, and
Alice B. Atwood, as conservatrix of the Estate of Richard W.
Atwood, N.C.M., Thomas H. Fisher and Ruth P. Fisher, Appellants,
v.
HUMBLE OIL & REFINING COMPANY, Appellee.
 No. 21606.
 United States Court of Appeals Fifth Circuit.
 Nov. 19, 1964, Rehearings Denied Jan. 26, 1965.
 
 Sidney Farr, Houston, Tex., Thomas H. Fisher, Chicago, Ill., Barrow, Bland, Rehmet & Singleton, Houston, Tex., of counsel, for appellants.
 Walter B. Morgan, Houston, Tex., Dillard Baker, Houston, Tex., of counsel, for appellee.
 Before HUTCHESON, RIVES and BROWN, Circuit Judges.
 HUTCHESON, Circuit Judge.
 
 
 1
 This case arose out of a dispute concerning the proper construction of a mineral lease and contemporaneous contracts executed on September 26, 1933, by the independent executors and trustees under the will of Mrs. Henrietta M. King, wife of the founder of the King Ranch, and Humble Oil & Refining Company. Mrs. King died in 1925, leaving the ranch in trust for a term of ten years to named trustees, three of whom were also named independent executors of her estate, whose duties included partitioning the estate among the persons designated in Mrs. King's will. The lease involved here was executed to Humble, Defendant-Appellee,[1] prior to the partition of Mrs. King's estate and is known as the King Ranch lease. Contemporaneously the trustees borrowed $3,500,000 from Humble, executing a contract which recited the details of the loan agreement. The parties also entered a 'non-exploration agreement', some provisions of which we will mention below.
 
 
 2
 Subject to the lease, the trustees on March 30, 1935, partitioned to the Atwood branch of the King family 10,809.9 acres in Jim Hogg County and certain acreage in Willacy and Kenedy Counties known as the Sauz Ranch. These tracts, together with two small tracts in Willacy County called the Bell and Bell B tracts are collectively known as the Atwood properties and all lie within the bounds of the Humble lease. In the partition deed the trustees also apportioned a part of the debts owed Humble to the lands partitioned to the Atwoods. The Atwood plaintiffs sue as successors to the original lessor's interest in that portion of the King Ranch partitioned to them. It was stipulated for purposes of this suit that plaintiffs Thomas H. Fisher and his wife, Ruth P. Fisher, have acquired 45 percent of the Atwood title.
 
 
 3
 The lease had a primary term of twenty years, ending on September 26, 1953. It provided that promptly after the end of the primary term Humble should designate 'the area or areas on which oil, gas and/or other minerals are then being produced * * *' and that the lease would continue in effect for the designated areas, but terminate as to all others. When the primary term ended there was production on the Atwood properties from the Willamar oil pools and the Tenerias gas pool on the Sauz Ranch and the Colorado oil pool in Jim Hogg County. Therefore Humble executed two instruments designating for retention those portions of the Atwood properties which it deemed to be 'producing areas' as of the end of the primary term. This included 50,476.6 acres on the Sauz Ranch, 480 acres of the Atwood acreage in Jim Hogg County, and the Bell and Bell B tracts in Willacy County.
 
 
 4
 In 1954 plaintiffs filed this suit to construe the lease and contemporaneous contracts, to recover damages for alleged breaches of the lease minimum production formula and reasonable development covenant, to secure their royalty interest in kind rather than money, to recover Humble's profits from refining oil alleged to belong to plaintiffs, to declare two large payments made to plaintiffs by Humble to have been for sale of specific oil rather than payment of royalty under the lease, to recover interest on money allegedly owed by Humble, and to secure certain production and reserve data from Humble concerning the entire King Ranch.
 
 
 5
 This is the latest, and should be the last, in a long series of protracted litigations concerning the King Ranch and the King Ranch lease.[2] The district court held for the defendant on all issues presented and entered judgment that plaintiffs take nothing. The record fully supports the findings, conclusions and judgment of the district court, and we could, without more, order the judgment affirmed. However, by way of explanation, we shall deal with each of the plaintiffs' contentions in turn, designating them by letter as they were presented to this court.
 
 
 6
 In their Contention A, plaintiffs argue that the area Humble designated as that portion upon which the lease should remain in force after the primary term of twenty years should be reduced so as to include only the pools of hydrocarbons actually in production at the end of the primary term. This portion of the case turns upon construction of the following lease provision:
 
 
 7
 'at the expiration of said twenty years if oil, gas or other mineral is then being produced from said land, the lessee shall promptly designate and define in writing the area or areas on which oil, gas and/or other minerals are then being produced, it being contemplated that lessee shall have the right to retain under the terms of this lease the area or areas included within the geologic structures or formations proven to be productive at the end of said twenty year period; and in determining what area or areas are proven to be productive only the area or areas shall be designated from which there are being produced oil, gas and/or other minerals at the end of such twenty year period, and in determining the extent of such productive area or areas consideration shall be given to geologic information obtained from all wells, including dry holes, if any, in the vicinity and from the surface geology and from investigation with geophysical instruments or methods and/or from other methods which then may be in use in the industry; and as to said area or areas the lease shall continue as long thereafter as oil, gas, or other mineral is produced therefrom.'
 
 
 8
 Plaintiffs do not attack Humble's designation of the Colorado Field in Jim Hogg County, but they contend that the designation on the Sauz Ranch property, including the Willamar oil pools and the Tenerias gas pool, was not properly made. Humble designated the area to be retained by a metes and bounds description, including the pools in one tract, on the theory that the designated area represented the surface above one geologic structure which Humble identified as a large anticline.
 
 
 9
 Plaintiffs first contend that the lease provision quoted above does not entitle Humble to retain an entire geologic structure but only the subterranean pools of hydrocarbons from which minerals are actually being produced. Their argument is that the 'area' is not to be designated by a metes and bounds description on the surface, but rather by delimiting the pools themselves, drawing their horizontal and vertical bounds. Under this three-dimensional designation theory Humble would be required to treat each pool of hydrocarbons as a separate 'producing area' so that the lease would remain in force beyond the primary term only on the pools themselves, and terminate as to the sands above and below the producing pools and in the remainder of what Humble contends is one geologic structure. In the alternative, plaintiffs argue that even if the lease does entitle Humble to retain an entire geologic structure the area designated by Humble is still too large, both horizontally and vertically. The plaintiffs contend that the horizontal designation is too large on the theory that there is not one geologic structure under this area, but rather two separate structures which should be separately designated. They contend that the lease calls for the designation to set vertical limitations because Humble is only entitled to retain the geologic structures and not the areas which lie above or below them.
 
 
 10
 The district court, sitting without a jury, made a finding of fact that the area designated by Humble is included in a single geologic structure, proven to be productive at the end of the primary term. The court construed the lease as authorizing Humble to designate the producing area by defining the boundaries of the tract or area of land overlying the geologic structure within which the producing pools occur. The court concluded that since the production is occurring from a geologic structure, the lessee is not limited in designating the area to the pools or reservoirs, but rather is authorized to designate the surface above the entire geologic structure. The district court held that the designation made by Humble was authorized by the terms of the lease.
 
 
 11
 There is a wealth of geological evidence, including maps and exhibits, generally accepted by both parties as accurate but the geologists testifying for the respective parties differ in their opinions as to the proper interpretation of that evidence. A careful review of the record convinces us that the evidence fully supports the district court's findings of fact on the geologic conditions in the disputed area. We also find the lease unambiguous and agree with the construction placed upon it by the district court. Plaintiffs' argument that the lease requires Humble to make a three-dimensional designation calls for a strained and artificial construction more calculated to ascertain the plaintiffs' present desires than the actual intent of the parties when they executed this lease. 'Area' was the basic term for that which was to be designated and is clearly more appropriate for surface measurement than three-dimensional measurements when used in the context of an oil and gas lease. As this Court said in Fleming v. Farmers Peanut Co., 128 F.2d 404 (5th Cir. 1942), 'The word area means a surface, a territory, a region * * *.' We are of the opinion that Humble properly designated the area upon which the lease is to remain in force. That designation is binding on both plaintiffs and defendant.
 
 
 12
 In their Contention B plaintiffs claim that Humble has produced less than the minimum quantities of oil and gas that it covenanted to produce and seek either damages for breach of the convenant or forfeiture of the lease except for twenty acres around each producing well (the maximum forfeiture provided in the lease upon termination for any cause). Humble is alleged to have breached the following provisions of the 'nonexploration' contract:
 
 
 13
 'We further agree subject to the orders, rules, and regulations of the Railroad Commission of Texas, and/or other lawful authority to produce from said leased premises currently approximately that portion of our total production in the State of Texas that we estimate the proven reserves on these leased premises are of our total proven reserves in the State of Texas from time to time.'
 
 
 14
 Since this covenant was entered before the partition of the King Ranch, the 'leased premises' to which it refers comprise the entire King Ranch. Humble supplied production and reserves data as to the Atwood properties and Humble's state-wide holdings, but did not produce data on the entire King Ranch production and reserves as separate figures, although they were included in its statewide figures. Plaintiffs assert their claim as owners of the Atwood properties, which were partitioned from the King Ranch, but argue that in order to calculate the minimum production required by the covenant they must be supplied with separate figures on Humble's production and reserves, year by year from 1933 to date of trial, on the entire King Ranch, not just the Atwood portion. The district court ruled that the defendant is not required to disclose this data because under its interpretation of the covenant such information is unnecessary.
 
 
 15
 Upon any breach of the minimum production covenant plaintiffs contend that damages accrue to the owner of each partitioned portion of the ranch on a pro rata basis according to the acreage he owns. Therefore, since the Atwood properties constitute 13.78% Of the total acreage under the King Ranch lease, plaintiffs assert that they are entitled to 13.78% Of any damages for lease-wide underproduction. In order to compute this alleged underproduction plaintiffs claim the right to discovery of production and reserves data on the remainder of the ranch in which they own no interest.
 
 
 16
 Since the partition of the King Ranch plaintiffs' share of the royalty from production on the ranch has been determined solely by the production from the property partitioned to them. Where land leased for oil and gas is subdivided in Texas, absent agreement to the contrary, the owner of the subdivided tract is entitled to all of the royalties resulting from the production of oil and gas upon his parcel of land. He does not share in the royalties of the whole undivided tract in the proportion that the area of his land bears to the entire tract. The leading Texas case is Japhet v. McRae,276 S.W. 669 (Tex.Comm.App. 1925, judg. adopted by Tex.Sup.Ct.). Plaintiffs do not contend that they are entitled to any royalty from production on land other than the Atwood properties and yet they claim to be entitled to share in damages awarded for alleged underproduction on the entire ranch. As we understand plaintiffs' argument they would prorate any such damages among the land owners solely on the basis of acreage owned, without regard to the reserves or the production on a particular landowner's property. The error this method would produce is illustrated by the following. The owner of a partitioned tract without known reserves would be entitled to share in any recovery for underproduction, in spite of the fact that he would be entitled to no royalties otherwise. The owner of a partitioned tract from which the lessee was producing in excess of the minimum required by the covenant would be entitled to share in any such damages even though the lessee was admittedly producing more from his tract than the formula required.
 
 
 17
 Plaintiffs are no more entitled to share in any recovery of damages for breach of the minimum production covenant on someone else's land than they are to share in royalty on production from that land. Their share of any damages for under production on the ranch as a whole should be calculated on the basis of the reserves and production on the Atwood properties, just as their share of the royalties is calculated from the production on that property. If the ranch-wide production and reserve data the plaintiffs seek were made available, the minimum production required for the entire ranch would be calculated as that percentage of the state-wide production that the ranch reserves are of the state-wide reserves. Plaintiffs would be entitled to that percentage of the minimum production required on the ranch as a whole that the reserves on the Atwood properties are of the ranch-wide reserves. This being the case, there is no reason why the minimum production required for their reserves cannot be calculated as a percentage of the state-wide figures without the necessity of having the data on the ranch as a whole. The minimum production to which the plaintiffs are entitled is the same by either calculation, so we see no need to remand this case for discovery of the data on the ranch as a whole. This is valuable information concerning property in which plaintiffs have no interest. We should not require its disclosure absent some need for it.
 
 
 18
 Perhaps it should be noted that when we speak of the minimum production required in terms of percentages of the state-wide production we recognize that there should be some allowance for a reasonable variance from the calculated minimum. The covenant obligates the lessee to produce 'approximately' that minimum and the approximation is based on the lessee's 'estimate' of the proven reserves. The covenant clearly contemplates a reasonable latitude in performance before a breach occurs.
 
 
 19
 Plaintiffs argue by analogy from the proposition that Humble could have defended this suit on a lease unit basis, Stephenson v. Glass, 276 S.W. 1110 (Tex.Civ.App.1925, error ref'd), that in defending this suit the damages must be calculated on a lease unit basis. Obviously Humble could be injured if it were required to defend a suit for underproduction on the leased premises by calculating production on each partitioned portion of the leased premises. It might be held to have breached the covenant as to one portion when its production on another was sufficient to offset that underproduction so that, considering the lease as a unit, there would be no breach. However, it is difficult to see how the plaintiffs are harmed here if Humble elects not to defend on a lease unit basis and calculates the minimum production required on the basis of a partitioned portion of the whole lease. Humble admits that it has waived any right to defend this suit on a lease unit basis. Such a waiver could increase Humble's obligations in some cases, but it could not decrease its obligations to the lessor.
 
 
 20
 For purposes of this suit, plaintiffs have calculated what they contend is the underproduction on the Atwood properties using the production and reserves data from that property, although they still argue they should have been given figures for the entire King Ranch. They calculated oil separately from gas, claiming damages to the full extent that either oil or gas fell below the alleged minimum, without regard to whether the other mineral was produced in excess of that minimum. They allowed no offset from the claimed underproduction in a particular year for those years in which Humble produced in excess of the minimum.
 
 
 21
 The district court entered fact findings that the actual production from the reserves at a rate above that required by the production formula more than offset any accumulated underproduction. The court found that at the time of trial the total production from the reserves had resulted in royalty income to the plaintiffs approximately one and three-quarters times the income required under the production formula. The court concluded that the nature of oil and gas in the reservoirs is such that the production formula agreement, couched in general terms with relation to reserves, is not to be construed as requiring production separately of a certain quantity of gas and a certain quantity of oil, but only such combined production of these substances as may be necessary to produce revenue to the royalty interest approximately equivalent to that which would have been realized by the literal and separate production of oil and gas in specific quantities. The court found that the defendant had not breached the production formula agreement in the contract.
 
 
 22
 We are in complete agreement with the district court's findings and conclusions of law. The covenant does not mention oil and gas separately, but speaks in terms of production from 'reserves'. There is nothing in the agreement that indicates it was contemplated that Humble should be required to produce a specific quantity of each mineral in each year. We are of the opinion that this covenant was designed to secure a fair level of royalty income to the lessor without regard to whether it came from oil or gas. When the production from the execution of the covenant to the date of trial is considered as a whole, allowing overages in oil to offset underproduction of gas, the defendant has clearly produced more than was required by the minimum production covenant. We find no breach of that covenant.
 
 
 23
 In Contention C, plaintiffs urge that Humble has breached the express covenant of reasonable development and ask that the lease be terminated except for twenty acres around each producing well. By the express covenant Humble agreed 'reasonably to develop the producing structure, that is, lessee agrees to develop the same to the extent that a reasonably prudent operator would develop it under the same or similar circumstances'. At the trial plaintiffs' geologist testified that a reasonable and prudent operator would have drilled approximately six to eight more wells than Humble did. Humble produced no contrary testimony but pointed to evidence in the record that shows it has drilled 179 wells on this property. The trial court found that Humble had not breached the covenant of reasonable development, and we are of the same opinion. Even if it were conceded that the lessee, who had drilled 179 wells, should have drilled six or eight more, that is not sufficient to constitute breach of a 'reasonable development' covenant. The over-all program of development that the plaintiffs' geologist suggested would be reasonable is too close to the program Humble actually followed to say that one is reasonable, the other unreasonable. The evidence fully supports the district court's finding of fact that the lessee has not failed reasonably to develop the lease premises involved in this litigation.
 
 
 24
 Plaintiffs' Contentions D and E are based on paragraph three of the lease which provides, in part:
 
 
 25
 '3. The royalties to be paid by lessee are: (a) On oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of lessors at the pipeline to which the wells may be connected;'
 
 
 26
 It is plaintiffs' contention that this provision expressly reserves a definite amount of royalty oil in kind to the lessors and that they have the right to demand delivery of their royalty oil in kind at any time they wish. They also contend that where Humble has processed some of plaintiffs' royalty oil without their consent and made a net profit therefrom, that this constitutes a conversion of the oil by Humble so that it became the constructive or resulting trustee of plaintiffs' oil. Plaintiffs claim that Humble should be required to account to them for any net profits which it made from processing that oil.
 
 
 27
 The district court entered findings of fact that plaintiffs did not demand delivery of royalty oil in kind at the time of the trial or at any time prior to trial. Nor did they tender any facilities for the taking of royalty oil in kind at the time of trial or prior thereto. The court also found that it is and has been the industry custom since some years prior to 1935 for the lessee to market all of the oil at the lease to the field purchaser if other than the lessee, or to purchase all of the oil from the lease at the field price if it is the purchaser in the field. The district court construed the lease and contemporary agreements as clearly contemplating the payment of royalty in money rather than in kind.
 
 
 28
 An examination of the lease and contemporaneous agreements as a whole, in an effort to see just what sort of arrangement the parties to this transaction contemplated, shows clearly that they intended to provide for payments by the lessee in money, rather than oil in kind. The opening clause of the royalty paragraph quoted above describes the royalties to be paid by the lessee. Obligations to be 'paid' are usually to be paid in money. P. G. Lake v. Commissioner, 148 F.2d 898 (5th Cir. 1945); Himes v. Himes, 55 S.W.2d 181 (Tex.Civ.App.1932). Paragraph nine of the lease, the clause relating to reduction of royalties in event of lessor's title failure, also uses the word paid: '* * * then the royalties to be paid lessors shall be reduced proportionately.'Looking at the contemporaneous agreements entered with the lease, the same intention is evident. As a part of the King Ranch deal Humble prepaid delay rentals for all of the twenty-year primary term. The 'non-exploration' agreement granted Humble the right to recapture the delay rentals out of royalty for and during each of the eleventh to twentieth years provided that the prepaid rental for a particular year could be recaptured only out of royalty produced during the same year. The loan agreement recognizes the rental recapture right and provides for its coordination with the collection of the loans. Both of these agreements provide for retention of funds by Humble out of the proceeds of the royalties. The 'non-exploration' agreement gave Humble the right
 
 
 29
 'to the retention of certain portions of the royalties * * * as its own property during the second ten year period thereof, to wit: one hundred twenty seven thousand eight hundred twenty-four and 60/100 dollars * * * and the retention may be made out of the proceeds of any royalties * * *.'
 
 
 30
 The loan agreement provides that Humble during the first ten years shall have the right to 'apply the proceeds of royalties' upon the notes and during the second ten year period 'to appropriate unto itself and retain as its own property the proceeds of all the royalties * * * to the extent of $127,824.60 each year and to apply the proceeds from all the royalties in excess of $127,824.60 each year upon the notes'. It is quite clear that the parties intended that Humble should convert the oil into money, retain the amount to which it was entitled under these agreements, and pay the remainder to the lessor.
 
 
 31
 We hold that the lease, when construed with these contemporaneous agreements, provides for payment by the lessee in money. The reference to delivery at the wells or to the credit of the lessor in the pipeline is apparently intended to fix the lease as the locality for determining the price at which the lessee is to make such payment. Were this intention not clear from the face of the instruments, which we believe it is, the industry custom recognized by the district court in its fact findings and the actions of the plaintiffs themselves would lead us to the same conclusion. The court found that it was customary for the lessee to market all of the oil at the lease to the field purchaser if other than the lessee, or to purchase all of the oil from the lease at the field price if it is the purchaser in the field. The plaintiffs admittedly neither requested delivery of the royalty oil in kind nor tendered any facilities for the taking of the oil in kind at the time of trial or at any time prior to trial, although there had been production on the Atwood properties since 1939. Such conduct is clearly inconsistent with the notion that this agreement was understood to call for delivery of the oil in kind, rather than a money payment.
 
 
 32
 It is, of course, apparent that our construction of the lease is fatal to plaintiffs' claims for net profits from Humble's processing royalty oil. That contention is based on the plaintiffs' allegation that the lease called for payments of royalty oil in kind. Since Humble is required to pay this royalty in money, not oil, plaintiffs cannot complain of Humble's processing of that oil or assert any interest in the profits from that processing.
 
 
 33
 In Contention F the plaintiffs assert that two large payments they received from Humble in 1949 and 1950 represented the purchase price of specific oil and should not be credited to Humble's royalty obligation under the lease. The payments in question were made while other litigation was pending in which plaintiffs attacked the validity of the Humble lease. During this period plaintiffs refused to accept royalty payments under the lease for fear their actions would constitute a ratification of the lease they were attacking. Prior to the payments involved here Humble had tendered many royalty checks to the plaintiffs, but they had refused to cash them. In view of the fact that the plaintiffs apparently needed money and Humble was anxious to settle its royalty obligation to them, negotiations were begun in 1948 to explore the possibility of making the payments under an agreement which would protect plaintiffs from any prejudice to their lawsuit then pending against Humble. These negotiations are evidenced by a series of letters which appear in the record. In 1949 the first payment was made under a contract by which plaintiffs acknowledged receipt of $363,024.66 as payment in full for 272,794.57 barrels of oil extracted by Humble from a portion of the Atwood properties 'and credited on its books of account to Edwin Atwood and Alice B. Atwood'. The contract provided that acceptance of this payment would not affect the litigation then pending between the Atwoods and Humble. About a year later the parties repeated this arrangement and a second payment was made in the amount of $1,025,942.65.
 
 
 34
 Plaintiffs now contend that these two payments were 'simple outright sales to Humble by plaintiffs of so many stipulated barrels of oil in return for so many stipulated dollars * * *' and that they cannot be credited to Humble's royalty obligation under the lease. They now assert that Humble still owes them royalty on all of the oil produced during that period except for that which was 'sold' under the two contracts, together with interest. The district court entered a fact finding that the lessee has paid plaintiffs for all royalty accruing to them under the lease.
 
 
 35
 The record in this case fully supports the district court's finding on this point. No one denied that the amount of these payments was determined by a calculation of the royalty due the plaintiffs under the lease. The mathematical formula which was used was 29/32 of 1/8 of 8/8 total runs. The figures obtained from that formula were reduced only by the amount to which Humble was entitled by virtue of the recapture clause in the agreement. In order to find that these two payments were not royalty, but actually payments for a 'simple sale of oil' by plaintiffs to defendant, we should have to reach the absurd conclusion that defendant already owned approximately 7/8 of the oil for which it paid plaintiffs. If these payments were not royalty, then the only interest in the oil they represented that plaintiffs had was 29/32 of 1/8. The remainder belonged to the lessee and another royalty owner. Yet plaintiffs were paid for 8/8 of that oil, less the amount subtracted under the recapture clause of the lease. This leaves little doubt but what Humble paid the plaintiffs their royalty, not a purchase price for specific oil that just happened to be the same amount as the royalty due.
 
 
 36
 The language of the contracts under which these payments were made, the correspondence reflecting the negotiations which led up to them, and the very manner in which the amount of the payments was calculated lead to the inescapable conclusion that all parties intended these two payments to be credited to Humble's royalty obligation to plaintiffs, and we hold that it must be so credited.
 
 
 37
 The agreement between the lessors and Humble included the following provision:
 
 
 38
 'Before making the application (of lessor's royalties) here provided for upon said mortgage notes (held by Humble as part of the mortgage and mineral lease transaction) out of the proceeds of said royalties, the lessors in said lease shall be entitled to retain a sufficient amount out of such proceeds to pay such income taxes as may be assessed against them by reason of their income from such royalties.'
 
 
 39
 Plaintiffs assert in Contention G that Humble did not provide them with funds to pay their income taxes in accord with this provision and that, therefore, Humble is liable to them for interest of 6 percent per annum on the funds they did not receive. The district court made the following fact finding:
 
 
 40
 'The lessee paid plaintiffs all sums due them under the lease as early as it reasonably could do so under all the circumstances associated with and resulting from the institution and prosecution by the plaintiffs of this and earlier litigation asking for cancellation or attacking the validity of the lease and seeking to set aside the partition of the King Estate and the (2023) Trustee's computation of fractional division of interest among the persons sharing therein.'
 
 
 41
 We see no need to review the extensive evidence on Humble's attempts to pay the plaintiffs and their refusal to cash the checks mailed to them. The evidence fully supports the district court's fact findings. We hold that Humble is not liable to plaintiffs for such interest.
 
 
 42
 The final contention raised by plaintiffs is based on the fact that the district court adopted the proposed findings of fact and conclusions of law drafted by counsel for the winning party. They urge that for this reason the judgment must be reversed and the cause remanded for a new trial before another judge, or in the alternative that this court should ignore the trial court decision and decide the fact questions as though it were the trial court. It is well settled that the practice of adopting the proposed findings and conclusions submitted by the winning party does not erase the 'clearly erroneous' rule. Vincent v. Suni-Citrus Products Co., 215 F.2d 305 (5th Cir. 1954); Louis Dreyfus & Cie. v. Panama Canal Co., 298 F.2d 733 (5th Cir. 1962). It is the duty of counsel to assist the court in obtaining complete and accurate findings. The record shows that the court instructed Humble to submit a copy of its proposed findings and conclusions to the plaintiffs. They were given ample time in which to suggest any changes they felt necessary, but the plaintiffs offered the court no assistance whatsoever, either by presentation of proposed findings or by criticism of those proposed by Humble. They are now in no position to complain of the court's findings simply because they are in accord with those suggested by the other party. Their whole argument rests on the unfounded assumption that the district judge failed to perform his duty of making findings and conclusions to support the judgment. By assuming that the findings do not represent the real determination and conclusions of the court, but were merely spoon-fed to the court, the plaintiffs impugn the integrity of the district court and make an unwarranted assumption that finds no support in the record. The findings and conclusions are fully supported by the evidence. We have considered each of the plaintiffs' contentions and find no error in the judgment of the district court.
 
 
 43
 It is therefore affirmed.
 
 
 
 [1]
 The parties will hereafter be designated as they appeared in the district court, Humble as defendant and the Atwoods and Fishers as plaintiffs
 
 
 [2]
 For the disposition of the earlier litigation see the following cases: Atwood v. Kleberg, et al., 133 F.2d 69 (5th Cir. 1943), rehearing denied 135 F.2d 453, cert. denied 320 U.S. 744, 64 S.Ct. 45, 88 L.Ed. 441; Atwood v. King et al., 163 F.2d 104 (5th Cir. 1947); Atwood v. Humble Oil & Refining Co., et al., 150 Tex. 617, 244 S.W.2d 637 (1951); Humble Oil & Refining Co. v. Fisher, 152 Tex. 29, 253 S.W.2d 656 (1952), cert. denied 345 U.S. 970, 73 S.Ct. 1112, 97 L.Ed. 1387